**Robert O. MARSHALL, Petitioner,**

v.

**Roy HENDRICKS, Superintendent, New Jersey State Prison, and John J. Farmer, Attorney General of New Jersey, Respondents.**

**Civil Action No. 97–5618 (JEI).**

United States District Court, D. New Jersey.

April 8, 2004.

Robert E. Bonpietro, Esq., Deputy Attorney General, Trenton, NJ, Robert B. Leaman, Esq., Supervising Deputy Attorney General, Whippany, NJ, for Respondents.

## OPINION

IRENAS, Senior District Judge.

Currently before the Court is Petitioner's application for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. The application comes to the Court on remand from the United States Court of Appeals for the Third Circuit as to the sole issue of whether Petitioner's counsel was constitutionally effective at the sentencing phase of Petitioner's capital murder trial. After holding an evidentiary hearing on Petitioner's claim, we find that counsel was not effective and grant Petitioner's application for writ of habeas corpus.

## I.

The procedural history of this case is extensively discussed in previous decisions of both this Court and the United States Court of Appeals for the Third Circuit. *See Marshall v. Hendricks,* 307 F.3d 36 (3d Cir.2002) (*"Marshall V"*); *Marshall v. Hendricks,* 103 F.Supp.2d 749 (D.N.J.2000)(*"Marshall IV"*).[1] Therefore, we will avoid an exhaustive recital of the procedural history and provide only a brief summary in order to put the current matter in context and to include the most recent proceedings. On May 5, 1986, Robert O. Marshall ("Marshall" or "Petitioner") was convicted in New Jersey state court of murder and conspiring to murder his wife, Maria Marshall, and was sentenced to death by lethal injection. *Marshall IV,* 103 F.Supp. at 757. Marshall's direct appeals at the state level were unsuccessful and, on October 30, 1997, he filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 with this Court.[2] Marshall's twenty-two count petition included claims of ineffective assis-

---

1. The post-trial history of this case relevant to this opinion is comprised of five separate decisions: *State v. Marshall,* 123 N.J. 1, 586 A.2d 85 (1991) (*"Marshall I"*) (direct appeal); *State v. Marshall,* 130 N.J. 109, 613 A.2d 1059 (1992) (*"Marshall II"*) (proportionality review); *State v. Marshall,* 148 N.J. 89, 690 A.2d 1 (N.J.1997) (*"Marshall III"*) (post-conviction relief appeal); *Marshall v. Hendricks,* 103 F.Supp.2d 749 (D.N.J.2000)(*"Marshall IV"*)(application for writ of habeas corpus); and *Marshall v. Hendricks,* 307 F.3d 36 (3d Cir.2002) (*"Marshall V"*) (appeal of district court's denial of writ).

2. The appeals process in this case is thoroughly discussed in *Marshall V,* 307 F.3d at 49–50.

tance of counsel at both the guilt and sentencing phase of his trial as well as requests for discovery and evidentiary hearings to explore those claims. On June 23, 2000, this Court, relying on the state court record and without holding separate evidentiary hearings, denied Marshall's application in its entirety. *Id.* Marshall then appealed to the Third Circuit.

On September 11, 2002, the Third Circuit affirmed this Court's denial of Marshall's application for writ of habeas corpus as to all issues except Marshall's claim of ineffective assistance of counsel during the sentencing phase of his trial. On that issue, the Third Circuit reversed and remanded, concluding that a determination of counsel's effectiveness at sentencing was impossible "without conducting an evidentiary hearing." *Marshall V,* 307 F.3d at 117. Pursuant to the Third Circuit's remand, this Court held an evidentiary hearing in September 2003, and heard final oral arguments on January 30, 2004, to determine the merit of Petitioner's claim that his counsel failed at every level to investigate, prepare, present, and argue a mitigation case during the penalty phase of his trial. *See* Br. Supp. Pet'r Robert O. Marshall's Pet. Writ Habeas Corpus at 51 [hereinafter Pet'r Br.].

## II.

As with the procedural history, the facts of this case have been thoroughly discussed in prior court decisions, *see Marshall V,* 307 F.3d at 44–48; *Marshall IV,* 103 F.Supp.2d at 758–59; *State v. Marshall,* 148 N.J. 89, 690 A.2d 1, 23–25 (1997) (*"Marshall III"*); *State v. Marshall,* 123 N.J. 1, 586 A.2d 85, 97–114 (1991) (*"Marshall I"*), therefore, the Court will relate only those facts relevant and necessary to the disposition of Petitioner's claim of ineffective assistance of counsel at the penalty phase.

On the morning of March 5, 1986, after a month-long trial, Robert Marshall was convicted of murder and conspiracy to commit murder in Superior Court of New Jersey, Criminal Division, Atlantic County for hiring someone to murder his wife, Maria.[3] *Marshall IV,* 103 F.Supp. at 757. Marshall was represented by Glenn Zeitz, a private attorney with experience defending capital cases. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 134, l. 9–22; Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 4–5.[4]

The jury rendered its verdict at approximately 11:30 a.m.[5] *See Marshall V,* 307 F.3d at 48 (stating that the verdict came in "shortly before noon"); *Marshall III,* 690

---

**3.** The trial began on January 27, 1986. *Marshall V,* 307 F.3d at 46. Closing arguments were held on March 3, 1986. *Id.* at 48. The court instructed the jury on March 4th and the jury returned with its verdict on the morning of March 5th. *Id.*

**4.** Marshall hired Zeitz in late September, 1984. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 9, l. 17–19.

The issue of the quality of Zeitz's representation at the guilt phase of the trial is not before us. The New Jersey Supreme Court, this Court and the Third Circuit have consistently found that during the guilt phase, Zeitz provided Marshall with constitutionally effective representation. *See Marshall IV,* 103 F.Supp.2d at 790; *Marshall V,* 307 F.3d at 88–94; *Marshall I,* 586 A.2d at 171 (finding

that defense counsel "provided a zealous and conscientious defense of his client throughout this protracted trial. Counsel was obviously well-prepared, thoroughly familiar with the record, and persistently and forcefully advocated his client's interests throughout the guilt phase proceedings").

**5.** The precise timing of the events surrounding the verdict and the penalty phase has been clouded by the general chaos that erupted in the courtroom when the verdict was delivered. *See* Tr. Sept. 9, 2003, Test. of Glenn Zeitz at 16, l. 16–17 (characterizing the atmosphere in the courtroom after the verdict was read as "pandemonium"). However, although the precise timing is unclear, the general sequence of the day's developments are not in dispute.

A.2d at 108 (Handler, J., dissenting) (stating that the jury returned its verdict "at approximately 11:30 a.m."). Immediately thereafter, Marshall's family members, including his youngest son John, his sister Oakleigh, and his brother Paul, left the courthouse to return to their home in Toms River, New Jersey, which is located roughly forty-five minutes away. Tr. Sept. 3, 2003, Test. of Douglas DeCarlo at 142, l. 10–18; Tr. Sept. 4, 2003, Test. of John Marshall at 133, l. 5–25. They did not return for the sentencing phase; indeed, nothing in the record indicates that they knew or understood that the penalty phase would be held that same day. Tr. Sept. 4, 2003, Test. of John Marshall at 133, l. 17–25; 134, l. 1; Tr. Sept. 8, 2003, Test. of Richard Ruffin, Jr. at 19, l. 15–21 (indicating that Oakleigh DeCarlo "rushed John, the youngest son, out of the courtroom in order to avoid the press and the activity and she thought that the penalty phase would follow in a few days and she was very surprised that the penalty phase went on in her absence"); Tr. Sept. 3, 2003, Test. of Douglas DeCarlo, at 143, l. 2–7 (stating that he "couldn't imagine" that his wife Oakleigh would have left the courthouse and not been present for the penalty phase had she known about it).

At approximately the same time, Marshall fainted while being led from the courtroom by Sheriff's officers. *Marshall V,* 307 F.3d at 48; *Marshall III,* 690 A.2d at 108 (Handler, J., dissenting). An ambulance was called at 11:36 a.m. and medical personnel took Marshall to a nearby hospital where he was treated by an emergency room physician at approximately 12:30 p.m. *Marshall V,* 307 F.3d at 48; *Marshall III,* 690 A.2d at 109 (Handler, J., dissenting). The hospital discharged Marshall at approximately 1:15 p.m., at which time Sheriff's officers returned him to the courthouse. *Marshall V,* 307 F.3d at 49; *Marshall III,* 690 A.2d at 109 (Handler, J., dissenting). Marshall arrived at the courthouse at approximately 1:30 p.m., fifteen minutes before the penalty proceeding began. *Marshall V,* 307 F.3d at 49.[6]

While Marshall was being treated at the hospital, Zeitz met with the prosecution regarding the penalty proceeding. Zeitz testified that he "extracted" an agreement from the prosecution as to how the penalty phase would be conducted. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 20, l. 12–25. The parties agreed that: (1) both the prosecution and the defense would waive openings, refrain from presenting evidence and limit themselves to a single short closing statement to the jury; (2) the prosecution would dismiss two of the three aggravating factors charged;[7] and (3) the prosecution would stipulate to a single mitigating fac-

---

**6.** Both the Third Circuit and the New Jersey Supreme Court put Marshall back at the courthouse at roughly 1:30. *Marshall V,* 307 F.3d at 49; *Marshall III,* 690 A.2d at 109 (Handler, J., dissenting) (noting that Marshall was discharged at 1:15 and that "according to the Sheriff's officers" the trip from the hospital to the courthouse "took between fifteen and twenty-five minutes"). In contrast, Zeitz testified that he believed he "had more than 15 minutes to talk" with his client. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 23, l. 18–20. The Court is persuaded, however, that Marshall could not have returned to the courthouse before 1:30 p.m.

Ultimately, however, the precise amount of time is not at issue. It is sufficient to say that

there was a relatively brief period of time, less than 30 minutes, between Marshall's return from the hospital and the start of the penalty phase.

**7.** The prosecution had charged three aggravating factors: (1) that the "defendant procured the commission of the murder by payment or promise of payment of anything of pecuniary value" (N.J.Stat.Ann. § 2C:11–3c(4)(e)); (2) murder for pecuniary gain (N.J.Stat.Ann. § 2C:11–3c(4)(d)); and (3) the heinous nature of the offense (N.J.Stat.Ann. § 2C:11–3c(4)©)). *See* Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 19, l. 1–14; *Marshall I,* 586 A.2d at 114. The prosecution agreed to dismiss the second and third of the factors. Tr. Sept. 3,

tor, namely, that Marshall did not have a prior criminal record.[8] Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 19–20; see also Tr. Sept. 8, 2003, Test. of Kevin Kelly at 151.

In arranging this agreement, Zeitz relied on information he had gathered in his investigation for the guilt phase. Prior to May 5, 1986, Zeitz had not specifically prepared for a potential penalty hearing. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 75–79, 82, 111. Neither Zeitz nor his investigator, Russell Kolins, ever had a targeted conversation with individual family members, friends, neighbors, or business associates to determine: (1) if any of those individuals would be willing to testify at a penalty phase should Marshall be found guilty; or (2) what those persons might say if called to testify. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 75, l. 8 to 76, l. 16; 82, l. 8–19; 126, l. 4–13.[9] Moreover, Zeitz had not hired a mitigation specialist, social worker, or psychologist [10] to evaluate Marshall, to interview potential witnesses, to investigate his school or medical records, or to conduct an investigation into the existence of any potentially mitigating information. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 111, 119–120. Therefore, at the end of the guilt phase, Zeitz did not have a draft list of potential mitigating factors, penalty phase discovery, or penalty phase witnesses. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 64–66.[11]

---

2003, Test. of Glenn Zeitz at 19, l. 25 to 20, l. 6.

8. N.J. Stat. Ann. 2C:11–3c(5)(f) provides that "the mitigating factors which may be found by the jury or the court [include that the] defendant has no significant history of prior criminal activity." The other mitigating factor presented to the jury was a "catch-all" factor set forth in N.J. Stat. Ann. 2C:11–3c(5)(h) which provides that the jury may consider "any other factor which is relevant to the defendant's character or record or to the circumstances of the offense."

9. Kolins does claim to have had such conversations, however, he has no notes of such conversations, he cannot identify names of the persons with which he spoke, nor can he identify the content of those discussions. Tr. Sept. 9, 2003, Test. of Russell Kolins at 218–219; 220; 230–31; 234. Zeitz's files do not contain these notes either, even though Kolins claims to have turned over his notes to Zeitz. See Id. at 251–52; see also Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 111, l. 14–18.

10. Marshall did receive mental health treatment prior to the start of the trial. Following an apparent suicide attempt on September 27, 1984, Marshall was briefly admitted to Point Pleasant Hospital. Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 30, l. 3–17. After Zeitz was notified of Marshall's condition, he contacted Dr. Elliot Atkins and arranged for him to talk to Marshall. Id. at 32, 34 (indicating that

if I had a situation, I would have like this, you'd have to get a psychologist or a psychiatrist, you got to get somebody to get in there and find out what the dynamics are in someone's mind, because it could affect a substantive defense, or how you handle a mitigation aspect of a case).

Marshall was then transferred to the Institute of Pennsylvania Hospital, a psychiatric facility, where he was treated by Dr. David Walzer. Id. at 41–42 (indicating that Dr. Walzer told Zeitz that Marshall was narcissistic and manipulative, that he was behaving in a sexually provocative way with staff members and seemed to exhibit no remorse over the death of his wife); see also Tr. Sept 11, 2003, Test. of Elliot Atkins at 34–37 (describing Marshall's stay at the Institute and noting that Dr. Walzer told Atkins that Marshall was depressed).

However, although Zeitz did obtain Marshall's medical records from his time at Point Pleasant, he admits that he never asked Dr. Atkins or Dr. Walzer for a report or diagnosis of Marshall's mental state, nor did he know if a diagnosis was ever made. Id. at 44, l. 8–16; 46, l. 11–25; see also Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 201, l. 25 to 202, l. 21.

11. The prosecutor in the case, Kevin Kelly, testified that when Zeitz approached him after the guilty verdict to discuss the penalty phase, Zeitz "asked me if I was going to produce any evidence [at the penalty hearing]. I said, well, that's going to be up to you in terms of what you're going to do. And he

Regardless, Zeitz prepared to go forward with the penalty phase that afternoon. In the fifteen minutes between Marshall's return to the courthouse and the start of the sentencing hearing, Zeitz had two conversations with his client regarding how to proceed. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 22, l. 2–12; 24, l. 1–13; 25, l. 1–9. The first conversation focused on the agreement made with the prosecution and whether Marshall's sons should testify in the penalty phase. *Id.* at 25, l. 1–9; 35–36. In that discussion, Marshall stated that he did not want his sons to testify and that he approved the agreement. *Id.* The second conversation confirmed with Marshall that they would proceed as per the agreement. *Id.* Zeitz

claims that he told his client that they could request a continuance, but Marshall did not want to wait. *Id.* at 26, l. 3–25. In fact, Marshall said that he just wanted to get it over with. Tr. Sept. 9, 2003, Test. of Robert Marshall at 28, l. 13–18 (indicating that upon his return from the hospital, Zeitz told him they could "do this now or later. What do you want to do" and that Marshall replied, "[l]et's get it over with"). Zeitz, therefore, did not request a continuance.

The penalty phase began at 1:45 p.m. with the parties explaining their agreement to Judge Manuel Greenberg outside the presence of the jury.[12] At 1:55, the jury was called in, and after introductory statements by Judge Greenberg, counsel

---

said, well, I've already, in terms of mitigating factors, I've already presented everything during the course of my case in chief and during the trial and there is *really nothing I can add to it.*" Tr. Sept. 8, 2003, Test. of Kevin Kelly at 151, l. 2–19 (emphasis added).

**12.** Tr. of Proceedings at 5–9, *New Jersey v. Marshall,* N.J.Super. Ct.Crim. Div., Atlantic County, Indictment No. 26–1–85, Supreme Court Docket No. 25532 (March 5, 1986). The transcript of that discussion is as follows:

THE COURT:
Gentlemen, we're now prepared, I believe, to move on to the penalty phase of this matter. I did have a discussion with counsel in chambers regarding the procedure that we're going to follow, and before we place that on the record, are counsel in agreement that that is the procedure that will be followed?

MR. ZEITZ:
Yes, sir.

MR. KELLY:
Yes, sir, your Honor.

THE COURT:
As I understand it, what will now occur is that I will now make the usual opening statement to the jury that is made in this proceeding. I believe that the law now is—I know that the law now is, expressly, that any evidence which was introduced in the trial can be considered as evidence for purposes of this proceeding. Given that, I understand that neither counsel intend to introduce any further evidence in this proceeding.

MR. KELLY:
That's correct, Judge.

MR. ZEITZ:
That's correct, Judge. I would like, at least, to have the record reflect that I've had an opportunity to speak with my client and discuss his right, if he desired, to call any witnesses with regard to the penalty phase of the proceedings, and it's his desire, and it is also my feeling, that we do not intend to call any witnesses at this stage of the proceedings. And we've had, I believe, an opportunity to discuss this, and this is his intention.
It's also based on the understanding that what we will do procedurally, is that Mr. Kelly and I will not make any opening statement to the jury at the penalty phase, but, in essence, what we will do is, I will make my summation arguments and then Mr. Kelly will make his to the jury.
I've aslo [sic] explained to my client, as part of this proceeding, which I think I should spread on the record, that the State, in its argument on the penalty phase, will be proceeding on one aggravating factor, and this is aggravating factor two as outlined in the notice of aggravating factors that was filed in this case at or about the time of the return of the indictment, which states that the defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value.
I've also explained to my client that there are two mitigating factors which I will be arguing to the jury at the penalty phase,

made their closing statements to the jury. *Id.* As per the agreement, Zeitz spoke first. The entirety of Zeitz's statement is as follows:

MR. ZEITZ:

Yes. Thank you, your Honor. It would be an understatement for me to say that this is not a difficult moment for me, and I'm sure it's difficult for everyone in terms of the proceedings that we now have to deal with.

What, in essence, we are at right now at this stage is a situation where the State has agreed that there is one mitigating factor which you must find exists in the case, and that that [sic] Rob Marshall has never had any type of criminal record of any kind.

The reason why I believe, when you look to the legislative history of the death penalty when it came into New Jersey that that clearly is a mitigating factor, is because, if you will, people feel, and I think quite rightly, that if you live a law-abiding life, that at some point in time you may be in a position where you may have to ask people to allow you to draw, if you will, maybe a credit because of the fact that you've led such a life. There are people obviously who have not led law-abiding lives and have been in situations where they've been in front of a jury and the jury has convicted them of a capital offense, and the jury will hear that this person has led a life, not lawabiding, but in fact, has had a juvenile record, has had a record of other offenses and, for the most part, has lived a life that in all ways, shapes, and forms never conformed to what our society at least requires.

number one—and I might add, Judge, that we did file, even though it was certainly premature, but we did file a notice of mitigating factors earlier in the case; specifically, that the defense will argue, number one, that defendant Robert O. Marshall has no history of prior criminal activity, and, I believe, I asked the Court in chambers to delete the word significant, because that seems to relate to a situation that where someone may have something—some blemish in their past, and the jury has to make some consideration as to whether or not that's significant or not, and I think the State is at least prepared to at least stipulate on the record that he has no history of prior criminal activity and, therefore, that, in essence, is a mitigating factor that they must find on his behalf.

Second, we will be arguing an additional mitigating factor which deals with anything that may relate to the character of the defendant, which I believe is the last mitigating factor that's referred to in the statute, and we are going to be arguing certain things with regard to his character which we'd ask the jury to consider as a mitigating factor.

I've explained to my client, in essence, that this is the procedure that I would like to adopt and follow at this stage, and it's my understanding that he is in agreement with this procedure.

THE COURT:

Very well. And, Mr. Kelly, I suppose you're in agreement with the procedure that we're about to follow.

MR. KELLY:

Yes, your Honor, I am.

THE COURT:

So then, first Mr.—following my statement, Mr. Zeitz would speak, followed by the Prosecutor, followed by my instructions.

MR. KELLY:

Yes, sir.

MR. ZEITZ:

Judge, can I ask this? Since we have agreed at least as to the one mitigating factor, perhaps I'm not sure how your Honor wanted to address that, but perhaps in the very beginning it can be stated to them, at least, that this is a mitigating factor which must be found by them, and the other—because that would pretty much set forth the ground rules of what would be left.

THE COURT:

Very well. I'll inform them of it. Can we have the jury, please?

In this particular case it's been agreed that Rob Marshall has led a law-abiding life, and that you must consider that as a mitigating factor.

The State has one aggravating factor which they are going to ask you to consider, and that is the fact, under the statute, this offense as you have found—and at this point, as a lawyer, I have to accept that you have found that—was procured by the payment or the thought of payment for some pecuniary gain.

The other mitigating factor that Judge Greenberg referred to deals with other circumstances and factors which a jury may consider in mitigation with regard to the death penalty. In this particular case, in addition to the fact that Rob Marshall has no prior criminal record, there's certain things, at least with regard to his life, that he has done, which he is entitled for you to consider.

He was involved in, among other things, with the Ocean County Businessmen's Association. You've heard that. He was campaign chairman for United Way, and for a number of years worked with them in community affairs, raising money for United Way. In addition to that, he served with his family on various social activities, involving the swim leagues and certain other things of a community nature. I don't want to stand here and go through the whole litany of things that he's done in forty-six years that—either for other people or for his family or of a civic nature. Suffice it to say, the record is substantial in that area, and you have an absolute right to consider that as a mitigating factor.

As the Judge told you, now, in terms of a defense, we do not have to prove to you that the mitigating factors in some way outweigh the aggravating factor. The State has to prove to you, beyond a reasonablbe [sic] doubt, and you certainly know what that standard is, because you've been told that and you've been explained that by counsel, you have to use that standard when you determine whether or not you feel he deserves the death penalty.

One thing I have to tell you about this, which I think makes it an individual decision for each one of you, and that is that the only way that the death penalty can be imposed is if all twelve of you agree to do it unanimously. So that you, in essence, have a power in your hands that, quite candidly, I would never have in my hands, because, as a lawyer, we generally don't serve as jurors. So I have no way of knowing what it must be like.

All I can say is this, that I hope when you individually consider the death penalty, that you're each able to reach whatever opinion you find in your own heart, and that whatever you feel is the just thing to do, we can live with it.

Tr. of Proceedings at 14–17, *New Jersey v. Marshall,* N.J.Super. Ct.Crim. Div., Atlantic County, Indictment No. 26–1–85, Supreme Court Docket No. 25532 (March 5, 1986). Mr. Zeitz did not present any witnesses, did not present any documentary or physical evidence and did not make a plea for his client's life. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 13, l. 6–19; 112, l. 13–24. Marshall did not speak on his own behalf. The Government then made its presentation.[13] After receiving their in-

---

**13.** Tr. of Proceedings at 17–19, *New Jersey v. Marshall,* N.J.Super. Ct. Crim Div., Atlantic County, Indictment No. 26–1–85, Supreme Court Docket No. 25532 (March 5, 1986). Mr. Kelly's statement to the jury is as follows:

structions and deliberating for ninety minutes, the jury sentenced Marshall to death by lethal injection. *Marshall V,* 307 F.3d at 98; *Marshall I,* 586 A.2d at 114.

## III.

■ 28 U.S.C. § 2254, the statute governing federal court review of habeas petitions brought by persons "in custody pursuant to the judgment of a State court," permits that review only where the petitioner alleges that he "is in custody in violation of the Constitution or laws or treaties of the United States." § 2254(a) (2004). Only after a petitioner successfully proves that he or she "seeks to apply a rule of law that was clearly established at the time his [or her] state-court conviction became final," may a federal court assess the merits of the habeas application. *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding

that the phrase "clearly established" "refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision").

In evaluating the merits of a habeas application, a federal court is permitted to grant a writ only where it finds that the adjudication of the claim on the merits in State court:

> (1)resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2)resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d);[14] *see also Marshall*

MR. KELLY:

> Ladies and gentlemen of the jury, there's not much more that I can say. You heard all the evidence in the case and all of the evidence presented, and in that regard I would ask you to accept that testimony for the purposes of your deliberations during this phase.
>
> The Court was correct in indicating that it is the State's position that the aggravating factor in this case is that this murder was committed by a defendant who paid a sum of money or gave a promise to pay an additional sum of money to have his wife killed, and that is our position as far as the aggravating factor is concerned. I really cannot think of anything more heinous in our society than to, you know, hire somebody to kill somebody else, let alone a family member; in this case, your wife.
>
> I would say to you, ladies and gentlemen, that you took an oath which you have followed so far in applying the law, and the law, as far as this stage is concerned and which his Honor will tell you, is that you have to determine whether or not that aggravating factor exists and whether or not the mitigating factors exist and whether those mitigating factors out-

> weigh that aggravating factor. And I say to you, ladies and gentlemen, to be fair about it. I cannot see how those mitigating factors come even close to, let alone outweigh, this aggravating factor.
>
> Maria Marshall had no prior criminal history. Maria Marshall was civic-minded, and this defendant did not give her the option of thirty years.
>
> And so I would ask you to continue with your deliberations and follow the law as his Honor instructs. Thank you.

**14.** This standard reflects the narrowing of habeas relief effectuated by Congress's passage of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub.L. No. 104–132, 110 Stat. 1214. The effect of AEDPA has been, in part, to "increase[ ] the deference federal courts must give to the factual findings and legal determinations of the state courts." *Werts v. Vaughn,* 228 F.3d 178, 196 (3d Cir.2000); *see also Bell v. Cone,* 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (noting that AEDPA amended habeas review "in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law"); *Dickerson v. Vaughn,* 90 F.3d 87, 90 (3d Cir.1996). In addition to narrowing the scope of habeas review for

*V*, 307 F.3d at 50; *Marshall IV*, 103 F.Supp.2d at 772–773.[15]

■■■ In *Williams*, the Supreme Court clarified the meanings of "contrary to" or "an unreasonable application of" Supreme Court precedent.[16] 529 U.S. at.413, 120 S.Ct. 1495 (stating explicitly that the two phrases have independent meanings). A state court decision is contrary to Supreme Court precedent if the state court reached a "conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Id.; see also Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Williams v. Price*, 343 F.3d 223, 228–29 (3d Cir.2003); *Werts*, 228 F.3d at 195–96. A state court's application of Supreme Court precedent is unreasonable "if the state court identifies the correct gov-

erning legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 365, 408, 413, 120 S.Ct. 1495. An unreasonable application must be "more than incorrect or erroneous" it must be " 'objectively unreasonable.' " *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *see also Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003); *Williams*, 529 U.S. at 409–411, 120 S.Ct. 1495.

Thus, to successfully apply for writ of habeas corpus under § 2254, Petitioner must demonstrate that: (1) at the time of his trial, the Supreme Court's standard for ineffective assistance of counsel was clearly established; and (2) the state court decision either contradicts that standard, *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495, or the "decision, evaluated objective-

prisoners in state custody, AEDPA imposes a one-year statute of limitations on petitions and prohibits successive petitions unless specifically approved by a circuit court. *See* Erwin Chemerinsky, Federal Jurisdiction § 15.2 (3d ed.1999) (discussing the changes brought about by AEDPA); 28 U.S.C. § 2241–2256.

*other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (stating that although § 2254 "requires us to give state courts' opinions respectful reading, and to listen carefully to their conclusions, [ ] when the state court addresses a legal question, it is the law 'as determined by the Supreme Court of the United States' that prevails").

**15.** In enacting AEDPA, the Supreme Court has stated that "it seems clear that Congress intended federal judges to attend with the utmost care to state-court decisions, including all of the reasons supporting their decisions, before concluding that those proceedings were infected by constitutional error sufficiently serious to warrant the issuance of the writ." *Williams*, 529 U.S. at 386, 120 S.Ct. 1495. The Supreme Court also noted, however, that merely because the "mood" of the statute suggests that federal courts must take care before finding a state-court decision constitutionally infirm, the statute does not require that "federal courts actually defer to a state-court application of the federal law that is, in the independent judgment of the federal court, in error." *Id.* at 387, 120 S.Ct. 1495 (noting that the word "deference" does not appear in the statute); *see also Lindh v. Murphy*, 96 F.3d 856, 869 (7th Cir.1996), *rev'd on*

**16.** Prior to the *Williams* decision, "several courts [had] recognized [that] the text of AEDPA offers little guidance to the courts charged with applying it." *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 887 (3d Cir.1999) (en banc) (citing *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (colorfully noting that "in a world of silk purses and pigs' ears, [AEDPA] is not a silk purse of the art of statutory drafting"); *O'Brien v. Dubois*, 145 F.3d 16, 20 (1st Cir.1998), *overruled by* 303 F.3d 24 (1st Cir.2002) (describing AEDPA as "hardly a model of clarity . . . and its standard of review provision is far from self-explicating")). Thus, prior to *Williams*, federal courts had interpreted 28 U.S.C. § 2254(d) as amended by AEDPA in widely disparate ways. *See Matteo*, 171 F.3d at 885–888 (discussing how different circuits had interpreted AEDPA's standard of review provision).

ly and on the merits, resulted in an outcome that cannot be reasonably justified." *Werts,* 228 F.3d at 204; *see also Matteo,* 171 F.3d at 888; *Rompilla v. Horn,* 355 F.3d 233, 250 (3d Cir.2004), *reh'g denied,* 359 F.3d 310 (3d Cir.2004).

■ As to the first element of a successful § 2254 application, Petitioner has met his burden of claiming a violation of a clearly established constitutional right. The Supreme Court first articulated the standard for ineffective assistance of counsel claims under the Sixth Amendment in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a full two years prior to Marshall's trial. Since that time, the Court has consistently applied the standard and recognized its clarity for the purposes of § 2254 petitions. *See, e.g., Williams,* 529 U.S. at 390, 120 S.Ct. 1495 (finding that petitioner met his burden under § 2254 where he claimed ineffective assistance of counsel, the merits of which were "squarely governed by … *Strickland* "). Thus, the Court may evaluate the substance of Petitioner's claim that the New Jersey Supreme Court's determination that he "was provided effective assistance of counsel at the penalty phase of his capital trial was contrary to, and an unreasonable application of, *Strickland v. Washington,*" requiring habeas relief. Pet'r. Br. at 47.

## IV.

### A.

The Sixth Amendment to the Constitution recognizes that defendants in criminal trials have a right to counsel in order to ensure that those trials are fundamentally fair.[17] See *U.S. v. Cronic,* 466 U.S. 648, 653, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (recognizing that the "accused's right to be

represented by counsel is a fundamental component of our criminal justice system"); *Powell v. Alabama,* 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (noting that a criminal defendant "requires the guiding hand of counsel at every step in the proceedings against him"); *Gideon v. Wainwright,* 372 U.S. 335, 344, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (characterizing criminal defense attorneys as "necessities, not luxuries"); *Johnson v. Zerbst,* 304 U.S. 458, 462–63, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) (finding that the right to counsel "embodies a realistic recognition of the obvious truth that the average defendant does not have the professional legal skill to protect himself when brought before a tribunal with power to take his life or liberty"); *see also Rompilla v. Horn,* 359 F.3d 310, 310 (3d Cir.2004)(asserting that "[a]ll other rights will turn to ashes in the hands of a person who is without effective, professional, and zealous representation when accused of a crime")(Nygaard, J.); *United States ex rel. Williams v. Twomey,* 510 F.2d 634, 640 (7th Cir.1975) (stressing the importance of counsel by writing that "[w]hile a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators"); Walter V. Schaefer, *Federalism & State Criminal Procedure,* 70 Harv. L.Rev. 1, 8 (1956) (noting that "[o]f all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have").

■ Yet, the mere presence of a lawyer does not satisfy the Sixth Amendment's mandate; ultimately, "the right to counsel is the right to the effective assistance of counsel." *McMann v. Richard-*

---

**17.** "In all criminal prosecutions, the accused shall … have the Assistance of Counsel for his defense." U.S. Const. amend. VI.

*son,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). The fact that "a person who happens to be a lawyer is present at trial alongside the accused ... is not enough to satisfy the constitutional command." *Strickland,* 466 U.S. at 685, 104 S.Ct. 2052; *see also United States v. Ash,* 413 U.S. 300, 309, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973) (noting that the "core purpose of the counsel guarantee was to assure 'Assistance' at trial"); *Argersinger v. Hamlin,* 407 U.S. 25, 31–32, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Avery v. Alabama,* 308 U.S. 444, 446, 60 S.Ct. 321, 84 L.Ed. 377 (1940) (recognizing that "[t]he Constitution's guarantee of assistance of counsel cannot be satisfied by mere formal appointment" of an attorney). Inasmuch as an effective attorney is required "to assure fairness in the adversary criminal process," *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981), "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

*Strickland,* 466 U.S. at 686, 104 S.Ct. 2052. Because the penalty phase in a capital case "is sufficiently like a trial in its adversarial format and in the existence of standards for decision" and because "counsel's role in the proceeding is comparable to counsel's role at trial," the analysis of an ineffective assistance of counsel claim is the same for both the guilt and penalty phases of capital trials. *Id.* at 686, 104 S.Ct. 2052 (internal citations omitted); *see also Wiggins,* 539 U.S. at 510, 123 S.Ct. 2527 (applying the *Strickland* standard to petitioner's claim that counsel was ineffective at the penalty phase of his capital trial); *Bell,* 535 U.S. at 685, 122 S.Ct. 1843; *Burger,* 483 U.S. at 776, 107 S.Ct. 3114; *Darden v. Wainwright,* 477 U.S. 168, 184, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).[18]

 Therefore, to successfully assert a claim for ineffective assistance of counsel, a defendant must prove: (1) "that counsel's performance was deficient" by showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) that defendant was prejudiced by the errors.[19] *Strick-*

---

**18.** Commentators have unsuccessfully called for a more stringent standard for defense counsel in capital cases. For example, Gary Goodpaster argues that:

> [t]he existence of a penalty phase in capital trials makes such trials radically different from ordinary criminal trials. A full capital trial is in fact two separate but intimately related trials: a preliminary guilt trial focusing on issues pertaining to the commission of a capital offense, and a subsequent penalty trial about the convicted defendant's worthiness to live. The guilt trial establishes the elements of the capital crime. The penalty trial is a trial for life. It is a trial *for* life in the sense that the defendant's life is at stake, and it is a trial *about* life, because a central issue is the meaning and value of the defendant's life ... The penalty phase of a capital trial differs so greatly from an ordinary criminal trial that the usual standards for assessing

competency of counsel in criminal cases are inadequate in death penalty cases.

Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases,* 58 N.Y.U.L.Rev. 299, 303–05 (1983); *see also The Eighth Amendment and Ineffective Assistance of Counsel in Capital Trials,* 107 Harv. L.Rev.1923 (1994) (arguing that "capital trials are so complex, and the death penalty so different in kind from other punishments, that, for capital defendants, the Eighth Amendment requires a higher standard of effective assistance of counsel").

**19.** Courts presume that "the lawyer is competent to provide the guiding hand that the defendant needs, [therefore,] the burden rests on the accused to demonstrate a constitutional violation." *Cronic,* 466 U.S. at 658, 104 S.Ct. 2039 (citing *Michel v. Louisiana,* 350 U.S. 91, 100–101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)); *see also Strickland,* 466 U.S. at 687,

*land,* 466 U.S. at 687, 104 S.Ct. 2052; *see also Rompilla,* 355 F.3d at 246; *Berryman,* 100 F.3d at 1094.

 Under the first prong of the test, defendant "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. Reasonableness is defined "by prevailing professional norms" accepted at the time of the representation. *Id.* at 688, 104 S.Ct. 2052. In the instant case, the standards at issue are those accepted in 1986.[20] This element does not require that a defendant receive perfect representation, but it does require that counsel act within the "wide range of reasonable professional assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *see also Burger v. Kemp,* 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987); *Kokoraleis v. Gilmore,* 131 F.3d 692, 696 (7th Cir.1997) (noting that "[t]he Constitution is satisfied when the lawyer chooses a professionally competent strategy that secures for the accused the benefit of an adversarial trial"); *Berryman v. Morton,* 100 F.3d 1089, 1101 (3d Cir.1996) (stating "[t]he right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued"); *Waters v. Thomas,* 46 F.3d 1506, 1518 (11th Cir.1995) (en banc)(finding that "perfection is not required" under the Sixth Amendment). To satisfy the second prong, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

 A defendant's burden to prove ineffective counsel "is a heavy one."[21] *Chandler v. United States,* 218 F.3d 1305, 1313 (11th Cir.2000). As the Supreme Court has stated, "[j]udicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "There is a 'strong presumption' that counsel's performance was reasonable." *Jermyn v. Horn,* 266 F.3d 257, 282 (3d Cir.2001); *see also Bell,* 535 U.S. at 687, 122 S.Ct. 1843 (noting that defendants must " 'overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy" ' ") (quoting *Berryman,* 100 F.3d at 1094); *see also Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955). This deference makes "strategic choices made after thorough investigation of law and facts relevant to plausible options . . . virtually unchallengeable." 466 U.S. at 690–91, 104 S.Ct. 2052.

 However, although the choices counsel makes with regard to strategy are nearly unassailable when made after a complete investigation of the facts and circumstances of the case, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations of the investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052. This fact sensitive inquiry ac-

---

104 S.Ct. 2052; *Chandler v. United States,* 218 F.3d 1305, 1313 (11th Cir.2000).

**20.** We will discuss the precise contours of those norms in Part IV.B.2.a, *infra.*

**21.** For example, courts have found that counsel was effective where an attorney slept dur-

ing a case, *McFarland v. Texas,* 928 S.W.2d 482, 505 (Tex.Crim.App.1996); where an attorney was "under the influence of alcohol" during trial, *Haney v. Alabama,* 603 So.2d 368, 377–78 (Ala.Crim.App.1991); and where counsel failed to present any evidence during sentencing, *Mitchell v. Kemp,* 762 F.2d 886, 888 (11th Cir.1985).

knowledges that strategic decisions can vary greatly from attorney to attorney and from case to case, but also demands that legal representation be based upon a comprehensive understanding of the underlying facts and circumstances of each individual defendant and each individual case. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 (finding that "[m]ore specific guidelines are not appropriate" and that "the [p]roper measure of attorney performance remains simply reasonableness under prevailing professional norms").

Having articulated both the standard for habeas review and the standard for the analysis of claims of ineffective assistance of counsel, we now turn to the application of these frameworks to Petitioner's claim that the New Jersey Supreme Court arrived at a decision contrary to or which constituted an unreasonable application of *Strickland.*

## B.

### 1.

■ As discussed above, a decision contrary to Supreme Court precedent is one in which the state court arrives at a "conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams,* 529 U.S. at 413, 120 S.Ct. 1495. We reject Petitioner's contention that the New Jersey Supreme Court's adjudication of Marshall's appeal was contrary to the holding in *Strickland.* Not only did the New Jersey Supreme Court correctly identify *Strickland* as the governing legal standard for claims of ineffective assistance of counsel based on the failure of counsel to appropriately investigate and present a mitigation case in the penalty phase of a capital trial, *see Bell,* 535 U.S. at 697–98, 122 S.Ct. 1843; *Darden,* 477 U.S. at 184, 106 S.Ct. 2464; *Burger,* 483 U.S. at 788,

107 S.Ct. 3114, but the Court also applied that framework in reaching its decision. *See Marshall III,* 690 A.2d at 34, 80–82 (clearly stating that Marshall's claims "are evaluated under the standards set forth in" *Strickland* ); *Marshall I,* 586 A.2d at 171. Therefore, the court did not reach a "conclusion opposite to that reached by the Supreme Court on a question of law."

Nor are we persuaded that the New Jersey Supreme Court decided the case differently than the United States Supreme Court on a set of materially indistinguishable facts. Although several Supreme Court decisions have applied *Strickland* to ineffective assistance of counsel claims at the sentencing phase of a capital trial, all are factually distinguishable from the present case. *See, e.g., Wiggins,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (where defendant was tried by a judge, not a jury; was represented by two public defenders rather than private counsel; where the parties conducted a full-fledged penalty phase; and where defendant had a history of sexual abuse); *Williams,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (where defendant confessed to killing two persons; had a history of criminal activity including theft, assault and arson; where counsel engaged in a full penalty hearing and not only introduced testimony from defendant's mother, neighbors and a psychiatrist, but also made a plea for mercy); *Bell,* 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (where defendant was convicted of two counts of first degree murder; conceded that he had committed the murders but raised an insanity defense permitting the introduction of extensive mitigation testimony during the guilt phase; and where counsel made a plea for his client's life at sentencing). Thus, the sole remaining issue is whether Petitioner is entitled to relief on the ground that the state court decision was an unreasonable application of *Strickland.*

## 2.

Petitioner's specific claims regarding Zeitz's representation can be grouped into two categories: "(1) lack of consultation, preparation, and investigation by counsel, and (2) lack of content or substance in counsel's representation at the penalty phase." *Marshall V,* 307 F.3d at 98–99. In the first category, Petitioner specifically alleges that: (1) Zeitz failed to prepare for or investigate a case for life; (2) Zeitz failed to discuss the penalty phase with Marshall; and (3) Zeitz failed to request an adjournment and permitted the penalty phase to commence immediately after Marshall's return from the hospital. *Id.* at 98. In the second category, Petitioner alleges that: (1) Zeitz failed to present mitigating evidence during the penalty phase; (2) Zeitz failed to humanize Marshall; and (3) Zeitz failed to make a plea for his client's life. *Id.* We will address each category in turn.

### a.

 Petitioner first claims that he did not receive effective assistance of counsel because Zeitz failed to investigate or prepare a case for life. "While '[i]t should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness' it is unclear how detailed an investigation is necessary" to ensure effective counsel under *Strickland. White v. Singletary,* 972 F.2d 1218, 1224 (11th Cir.1992) (internal citation omitted). Satisfying *Strickland's* investigation mandate, therefore, ultimately turns on counsel's adherence to the professional standards for investigation and preparation of a mitigation case at the time of trial. In

defining what constitutes a complete investigation in this matter, therefore, we look to the prevailing professional norms as they existed in 1986.

In 1986, the ABA Standard for Criminal Justice ("Standard") stated:

It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

Standard for Criminal Justice, 4–4.1 (2d ed.1980); *see also Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052 (discussing the use of ABA standards as guides for determining "prevailing norms of practice"); *Rompilla,* 355 F.3d at 259 n. 14 (referring to the ABA standards as "important guides" although cautioning against viewing them as "a codification of the requirements of the Sixth Amendment"). The Standard, coupled with *Strickland's* explicit language requiring a thorough investigation into facts relevant to both guilt and sentencing, clearly show that a separate penalty phase investigation was the very foundation of reasonable representation in 1986. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

Actual courtroom practice of capital defenders in New Jersey also reflects their understanding of this obligation to investigate. In the fifty-five capital cases tried in New Jersey state courts between 1982 [22]

---

**22.** 1982 was the year that the New Jersey state legislature reinstated the death penalty in New Jersey after a ten-year hiatus. N.J.

Stat. Ann. § 2C:11–3 (West 1982); *see also State v. Funicello,* 60 N.J. 60, 286 A.2d 55 (1972) (accepting the United States Supreme

and the spring of 1986 when Marshall was convicted and sentenced, counsel in every case presented at least some type of penalty phase mitigation evidence, illustrating an underlying penalty phase investigation. In all but four of those cases, counsel called at least one witness on behalf of the defendant, and in the vast majority (forty-seven out of fifty-five), called at least one family member. *See* Def. Ex. 14 (providing a summary of each of the fifty-five cases);[23] *see also* Tr. Sept 11, 2003, Test. of William Graves at 70, l. 22 to 71, l. 11 (indicating that both private attorneys and public defenders trying cases at the time uniformly introduced at least some testimony at the penalty phase); Tr. Sept. 10, 2003, Test. of Carl Herman at 36, l. 1–5 (noting that in eighty to ninety percent of the capital cases tried in New Jersey in the early 1980's at least one family member testified for the defendant at the penalty phase). Further, in the few penalty hearings where counsel relied predominately on evidence presented during the guilt phase, that evidence was clearly mitigating in nature.[24] These cases, taken as a whole, show that New Jersey attorneys trying capital cases in the early to mid–1980's recognized and complied with a professional standard for investigation that included interviews with family members and other witnesses, an examination of an array of other mitigation evidence, and presentation of that evidence at sentencing.[25]

Thus, it is clear that in light of *Strickland's* holding, the ABA Standards and the practice of New Jersey attorneys in 1986 that capital defense attorneys were expected to conduct a separate investigation into facts relevant to a penalty phase.[26] The

Court's declaration that the New Jersey death penalty statute was unconstitutional and striking the statute). For a discussion of the history of the death penalty in New Jersey, see Edward Devine, et al., *Special Project: The Constitutionality of the Death Penalty in New Jersey*, 15 Rutgers L.J. 261 (1984).

**23.** The chart provided the following information for each of the cases: (1) the case name; (2) whether defense counsel was a public or private attorney; (3) the sentence imposed; (4) testimony or evidence offered in the penalty phase; (5) the nature of the State's evidence and the type of defense offered; and (6) the length of time between the guilt phase verdict and the penalty phase verdict. Def.'s Ex. 14.

**24.** Counsel in those cases relied on medical testimony regarding defendant's mental capacity, psychological evidence relating to emotional disturbance or insanity or some form of serious childhood abuse or trauma. *See* Def. Ex. 14.

**25.** Indeed, these cases show capital defenders introducing evidence ranging from mental retardation, insanity, childhood trauma and abuse to close and loving family relationships, pleas for mercy and perceptions of emotional harm to defendant's family members should the defendant receive a death sentence. *See* Def. Ex. 14.

**26.** In addition, scholarly commentary written prior to 1986 provided guidance to capital defenders with regard to the scope and importance of investigation prior to the sentencing phase of capital trials. In stressing the need for thorough investigation, Gary Goodpaster noted that

> [i]mportant consequences flow from the fact that both as a legal and a practical matter, the penalty phase is a trial for life. Trial counsel has a duty to investigate the client's life history, and emotional and psychological make-up, as well as the substantive case and defenses. There must be an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings. The affirmative case for sparing the defendant's life will be composed in part of information uncovered in the course of this investigation. The importance of this investigation, and the thoroughness and care with which it is conducted, cannot be overemphasized.

Goodpaster, *supra*, at 324; *see also* Ivan K. Fong, Note: *Ineffective Assistance of Counsel at Capital Sentencing*, 39 Stan. L.Rev. 461,

standards and practices of the day underscore the reality that:

> "[the] right to present, and to have the sentencer consider, any and all mitigating evidence means little if defense counsel fails to look for mitigating evidence or fails to present a case in mitigation at the capital sentencing hearing." Accordingly, counsel's general duty to investigate takes on supreme importance to a defendant in the context of developing mitigating evidence to present to a judge or jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care.

*Strickland,* 466 U.S. at 706, 104 S.Ct. 2052 (Brennan, J., concurring) (internal citations omitted).

 Thus, although no "absolute duty exists to investigate particular facts or a certain line of defense," *Chandler,* 218 F.3d at 1317, counsel "has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary." *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Here, Zeitz's representation fell below the professional standard because he failed to conduct **any** investigation into possible mitigating factors and provides no objectively reasonable justification for failing to do so. *See, e.g., Dobbs v. Turpin,* 142 F.3d 1383, 1387 (11th

Cir.1998) (affirming the district court's finding that defense counsel's representation was ineffective where counsel had failed to conduct a reasonable investigation of defendant's background and produced no mitigating evidence at the penalty phase); *Horton v. Zant,* 941 F.2d 1449, 1462, 1462–463 (11th Cir.1991) (finding defense counsel's representation deficient during the sentencing phase where counsel failed to investigate and present mitigating evidence and attacked the client's character and separated himself from his client during his closing statements); *cf. Rompilla,* 355 F.3d at 250–53 (rejecting petitioner's ineffective assistance of counsel claim at sentencing where defense counsel had a good working relationship with defendant, questioned him extensively about his background, interviewed defendant's siblings and other family members and hired three mental health professionals to evaluate defendant in preparation for the penalty phase).

 First, Zeitz's testimony and notes indicate that neither he nor his investigator, Russell Kolins, ever had a single targeted discussion with any member of Marshall's family, with his clergy, or with neighbors, friends or business associates regarding either their willingness to testify at a penalty phase or what they would say if called to testify.[27] This failure to investigate is particularly troubling giv-

---

480–81 (1987)(citing trial manuals available for capital defenders including those produced by the Southern Poverty Law Center and the California Office of the State Public Defender and suggesting that "courts should regard any decision not to investigate or present mitigating evidence as tending to indicate ineffective assistance of counsel").

Goodpaster also notes that, "[t]he timing of this investigation is critical. If the life investigation awaits the guilt verdict, it will be too late. Although a continuance should be requested and may be granted between the guilt and penalty phases of the trial, it is likely to be too brief to afford defense counsel the

opportunity to conduct a substantial investigation." Goodpaster, *supra,* at 324.

**27.** Zeitz relied on Kolins to investigate for the guilt phase. Zeitz did not hire a separate investigator for the penalty phase or a mitigation specialist to assist in preparing for sentencing. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 111, l. 19 to 112, l. 1. Although there is evidence to suggest that retaining a mitigation specialist was standard practice in 1986, *see* Tr. Sept. 10, 2003, Test. of Carl Herman at 44, l. 17 21, the Court does not find that failure to hire a mitigation specialist to prepare a social history is *per se* unreasonable.

en the apparent plethora of potentially useful mitigation witnesses available to the defense at the time of the trial.[28] Petitioner has identified sixteen people who have indicated that neither Zeitz nor Kolins ever: (1) spoke to them about a penalty phase; (2) asked them if they would be willing to testify at a penalty phase; or (3) asked them what they would be willing or able to say if they did testify. Every one of those sixteen people has stated that had he or she been asked, he or she would have agreed to provide mitigation testimony on Marshall's behalf. The list includes: Thomas North, Marshall's childhood friend;[29] Paul Marshall, Marshall's brother;[30] Cathy Clement,[31] Mary Jane Dougherty[32] and Oakleigh DeCarlo,[33] Marshall's

28. The Court is aware that "[i]t is common practice for petitioners attacking their death sentences to submit affidavits from witnesses who say they could have supplied additional mitigating [ ] evidence, had they been called or . . . had they been asked the right questions." Waters v. Thomas, 46 F.3d 1506, 1513–14 (11th Cir.1995) (en banc). "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Id. Thus, we are not swayed by the mere existence of the list of persons willing to testify on Marshall's behalf. Rather, we find Zeitz's failure to interview any of them unreasonable.

29. North indicated that he would have told the jury that he loved Marshall, that executing him would be a hardship on North and his family and he would have asked the jury to spare Marshall's life. Tr. Sept. 8, 2003, Test. of Richard Ruffin at 32–33.

30. Paul Marshall indicated that he would have told that jury that he loved his brother, that executing him would be a hardship to both Marshall's sons and siblings and would have asked the jury to spare his brother's life. Tr. Sept. 8, 2003, Test. of Richard Ruffin at 30, l. 8–22 (stating that Paul told him that Marshall's execution "would be devastating to my sisters, especially my younger sister Cathy, and it would be devastating to Rob's youngest son John").

31. Clement would have testified that she loved her brother, that she believed Marshall loved his sons, that his sons would have been harmed if he was executed, that she feared for John Marshall's mental health if his father was executed and that Marshall's execution would " 'give me a nervous breakdown.' " Tr. Sept. 8, 2003, Test. of Richard Ruffin at 28, l. 19 to 29, l. 6. Clement also would have asked the jury to spare her brother's life. Id. at 28, l. 9–11.

32. Dougherty also would have asked the jury to spare her brother's life because a death sentence would be an emotional hardship on Marshall's sons and his siblings. Tr. Sept. 8, 2003, Test. of Richard Ruffin at 27, l. 10–25. Dougherty also could have testified to Marshall's involvement with his sons' activities and his love and support for the three boys. Id. at 28, l. 1–8.

33. Oakleigh died in 1998, but prior to her death spoke with Richard Ruffin in his capacity as an investigator for the New Jersey Public Defender. Oakleigh would have testified that she "loved her brother and she would have asked the jury specifically to spare his life." Tr. Sept. 8, 2003, Test. of Richard Ruffin at 19–21. Oakleigh also would have described her warm and loving relationship with her brother, his position as a role model in her family when they were growing up, his joy in being a father, and his love and support for his sons. Id. at 21–24. Oakleigh also would have testified to her belief that executing Marshall would emotionally damage his sons, particularly John. Id. at 24. Oakleigh's husband Douglas DeCarlo also testified to her close bond with Marshall and to his belief that "without a doubt" she would have been "able and willing" to testify as a mitigation witness. Tr. Sept. 3, 2003 at 141.

Counsel's failure to talk to Oakleigh is all the more puzzling given her extensive involvement with the case. Oakleigh was in regular contact with Zeitz, frequently attended the trial, testified in the guilt phase on Marshall's behalf and had provided Zeitz with family photographs for use at sentencing. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 67, l. 8–23 (indicating that he and Oakleigh communicated on a weekly basis and that "she was like a lifeline in terms of keeping me abreast of what was going on with the boys").

sisters; Michael Conlin [34] and Bill Lundy,[35] acquaintances from the Tom's River Swim Program; Reverend James McColl, Marshall's prison minister; [36] Nikki Daly, Marshall's long-time secretary; [37] Thomas and Lynn Fenwick, Marshall's neighbors; [38] Stanley Slaby, Marshall's friend; [39] Henry Tamburin [40] and Ev Hutchison,[41] Marshall's business associates; Douglas De-Carlo, Marshall's brother-in-law; [42] and John Marshall, Marshall's youngest son.[43]

34. Conlin would have agreed to testify to Marshall's on-going support of the high school swim team, his fund-raising for the team and support of his son John's involvement in swimming. Tr. Sept. 8, 2003, Test. of Richard Ruffin at 35–36 (stating that Conlin said he "never had a negative experience with Marshall").

35. Lundy could have testified to Marshall's involvement in fund-raising for his son's swim team activities and that " 'Rob did a lot for kids.' " Tr. Sept. 8, 2003, Test. of Richard Ruffin at 36–37.

36. Reverend McColl began ministering to Marshall after his arrest and continues to provide spiritual counseling to Marshall today. Tr. Sept. 8, 2003, Test. of Lois Nardone at 162, l. 18–25. McColl would have been willing to testify that he was ministering to Marshall and that it was his belief that Marshall was "truly sincere in his interest to embrace the Christian faith." *Id.* at 165, l. 7–19.

37. Daly would have testified that Marshall was very involved in community activities such as the United Way, that he was a good employer who treated her well, the he was a considerate and generous man who was supportive of her when her husband died. Tr. Sept. 8, 2003, Test. of Richard Ruffin at 38, l. 10–24; *see also* Tr. Sept. 8, 2003, Test. of Carol Krych at 190–194.

38. Mrs. Fenwick indicated that she would have described Marshall as a pleasant, easy-going man who was dedicated and devoted to his family. Tr. Sept. 8, 2003, Test. of Carol Krych at 196, l. 18–25 (noting that she knew Marshall because their children swam together on a local team). Mr. Fenwick described Marshall similarly and indicated that he could have testified to Marshall's devotion to his children. *Id.* at 197, l. 13–24. Mr. Fenwick also indicated that although he believed Marshall to be guilty, he did not believe he deserved the death penalty. *Id.* at 199.

39. Slaby would have testified that he knew Marshall through the Tom's River Country Club, that Marshall was "very, very fond of his sons, [and that] he did a lot with them and for them." Tr. Sept. 8, 2003, Test. of Lois Nardone at 172–73. Slaby also would have described Marshall as a "hard worker who provided well for his family." *Id.* at 173, l. 20–22.

40. Tamburin could have testified to his belief that Marshall " 'really loved his kids' " and that " 'he was very supportive and encouraging to their dreams.' " Tr. Sept. 8, 2003, Test. Lois Nardone at 170, l. 20–25. Tamburin described Marshall as smart, hard-working and well-respected in the community. *Id.* at 171, l. 2–8.

41. Hutchinson indicated that he would have been willing to testify that Marshall was a genuine, hard-working man. Tr. Sept. 8, 2003, Test. of Carol Krych at 202, l. 11–20.

42. DeCarlo testified that he would have been willing to testify as a mitigation witness in Marshall's penalty proceedings, but that he was never asked. Tr. Sept. 3, 2003 at 145, l. 3–7, 12–16. DeCarlo testified further that he would have told the jury that Marshall "was a very caring and loving father" who was involved in his sons' lives, who "provided very well for them, often rearranged his work schedules to be able to participate in their activities, and just seemed to be a real good father." *Id.* at 145, l. 17 to 146, l. 1. DeCarlo also indicated that, despite his belief in the death penalty and the fact that he had considered the possibility that Marshall was, in fact, guilty, he would have testified as a mitigation witness. *Id.* at 161, l. 9 to 162, l. 13.

43. John Marshall testified that neither Zeitz nor Kolins ever explained what a penalty phase was or asked him if he would be willing to testify. Tr. Sept. 4, 2003 at 133–134. John stated that he "most definitely" would have testified if asked, that he would have asked the jury to spare his father's life and would have told the jury that "my father was a loving father, and devoted to my brothers and I." *Id.* at 134–138.

Zeitz also failed to interview potential expert witnesses available to him.[44]

In addition, neither of Marshall's two other sons, Robby and Chris, were asked to testify at the penalty phase. The record is clear that neither Zeitz nor his investigator Kolins ever specifically asked the boys what they thought, if they would be willing to testify or what they might say if called. *See* Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 35, l. 14–19 and at 40, l. 5–8; Tr. Sept. 10, 2003, Test. of Russell Kolins at 251–55; 258–59 (testifying that although he asked Robby and Chris once if they would be willing to testify as mitigation witnesses, he never followed up on their inconclusive responses of "I'll think about it" (Chris) and "I'll let you know" (Robby)).

■ Zeitz offers several explanations for why he never interviewed any of these individuals. Zeitz argues that his decision not to call Robby or Chris was based on his "understanding" that both boys believed their father was guilty and would not testify on his behalf. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 40, l. 23 to 41, l. 7 and at 51, l. 4–7. However, it is clear from the testimony before this Court that no one was certain exactly what the boys believed. Their uncle Douglas DeCarlo, brother and father all believed that the boys supported their father until at least a year after the trial. *See* Tr. Sept. 3, 2003, Test. of Douglas DeCarlo at 144, l. 1–8 (stating that the boys remained supportive of their father during the trial and that all three would have been willing to ask a jury to spare their father's life); Tr. Sept. 4,

2003, Test. of John Marshall at 132–34 (testifying that "there was no doubt in his mind" that his brothers would have asked a jury to spare their father's life, and that the night before the verdict the three boys "assumed their father was going to be acquitted"); Tr. Sept. 9, 2003, Test. of Robert Marshall at 32 (stating that he and his sons "were all very close, very tight. They were all very supportive and they were until a year after the trial"). In contrast, Ted Serrao testified that both Robby and Chris began to believe their father was guilty in the months subsequent to their mother's murder. Tr. Sept. 11, 2003, Test. of Ted Serrao at 8–10, 22–23 (although admitting he never spoke with the boys directly about whether they thought their father should be executed). Even if the boys firmly believed in their father's guilt, however, it does not automatically follow that they would be unwilling to plead for his life. Family members who believe in a defendant's guilt can still be valuable mitigation witnesses. *See* Tr. Sept. 8, 2003, Test. of Richard Ruffin at 16–17 (testifying that even family members who believe in a defendant's guilt can "absolutely" be mitigation witnesses); Tr. Sept. 11, 2003, Test. of William Graves at 44, l. 6–13 (stating that he believed that a child can believe in his or her parent's guilt and still ask a penalty phase jury for mercy); Tr. Sept. 3.2003, Test. of Douglas DeCarlo at 161, l. 9 to 162, l. 13 (testifying that despite his belief in the death penalty and the fact that he had considered the possibility that Marshall was, in fact, guilty, he would have testified on his be-

---

44. For example, Zeitz had available to him experts such as Isaac Ballard who testified that he would have been willing and able to provide information regarding the contribution Marshall could have made in the prison system. Tr. Sept. 8, 2003, Test. of Isaac Ballard at 100–102; 111 (stating that, in 1986, similar experts were available and had provided mitigation evidence of this type); *see*

*also* Tr. Sept. 10, 2003, Test. of Carl Herman at 58, l. 19 to 59, l. 22 (indicating that experts such as Ballard were called in the mid–1980's to provide mitigation testimony). Zeitz also had contact with Dr. Elliot Atkins, who could have provided testimony regarding the potential harm that Marshall's execution could have had for Marshall's sons. Tr. Sept. 11, 2003, Test. of Elliot Atkins at 42–46.

half and asked the jury to spare Marshall's life); *see also* Tr. Sept. 8, 2003, Test. of Carol Krych at 199 (testifying that Tom Fenwick told her that although he believes Marshall to be guilty, he does not think Marshall deserves a death sentence). Therefore, Zeitz had no reasonable basis not to interview both boys.[45] Strikingly, even the State's own witness, William Graves, testified that he believed Zeitz should have interviewed all three boys directly. Tr. Sept. 11, 2003, Test. of William Graves at 80, l. 12–22; 82–83;[46] *see also* Tr. Sept. 10, 2003, Test. of Carl Herman at 32, l. 12–16 (testifying that, in his expert opinion, "Zeitz failed to properly investigate, identify and present a case for life for Robert Marshall. And in my opinion that was—did not meet the prevailing norms of representation in a capital case in 1986").

With regard to John Marshall, Zeitz expressed concern that it would hurt Marshall to call only John, rather than all three boys. Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 127, l. 8–20 (wondering how it would look to the jury if he put only one of the boys on to testify in the penalty phase). Not only does this concern provide absolutely no explanation for why Zeitz did not at least interview John, it also makes an unreasonable assumption that the jury would be unwilling to spare Marshall's life for the sake of one child. *See* Tr. Sept. 10, 2003, Test. of Carl Herman at 174, l. 10 to 175, l. 10 (stating that even if the two oldest boys were unwilling to testify, "[t]he jury can save Marshall's life for the sake of his youngest son"); *see also* Tr. Sept. 8, 2003, Test. of Richard Ruffin at 16, l. 6–17 (stating that he found the Marshall case "lacking" because Zeitz did not call Marshall's sons to testify and that by not having even one of his sons in the courtroom during the penalty phase, Zeitz created the "opposite effect of having a child testify"). Zeitz not only assumed, without any basis in fact, that Robby and Chris would not plead for their father's life, but he also squandered the opportunity to measure the scope and strength of John Marshall's testimony by failing to interview him or have his investigator do so.

With regard to family members, friends, neighbors, business associates and other

---

**45.** Zeitz also testified that he accomplished all he intended with respect to the boys testifying when he put them on the stand to address their father's state of mind on September 27, 1984. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 47, l. 1–20; 54, l. 14–17 (testifying that "the bottom line is once I was satisfied that I got the boys in the guilt phase, and I saw the reaction of the jury in the guilt phase of the case" he was content not to use the boys in the penalty phase); Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 121–122 (stating that he thought he had hit a "triple" with the boys' testimony and agreeing with the Court that he did not believe there was anything more he "could do to increase the impact of that testimony").

However, the boys' testimony was limited to describing their father's state of mind during three separate phone calls Marshall made to each boy on September 27, 1984, prior to Marshall's attempted suicide. Pet.App. at 50–

69. John testified that his father sounded depressed and upset. *Id.* at 55–56. Chris testified that his father sounded nervous and that he sounded like he was saying goodbye. *Id.* at 57–60. Robby's testimony was slightly more encompassing, as he also testified to the events of September 6, 1984, but as to the phone call he stated that his father sounded "shaky." *Id.* at 60–69.

**46.** In addition to stressing that Zeitz should have interviewed both Robby and Chris Marshall, Graves testified that he would not have "written off" Oakleigh as a mitigation witness without talking to her either. Tr. Sept. 11, 2003, Test. of William Graves at 83, l. 12–18.

Graves further testified that without conducting an "adequate investigation, [Zeitz was] not in a position to determine what he should put on and what he should not put on." *Id.* at 81, l. 12–17. A point with which this Court heartily agrees.

identified potential witnesses, Zeitz's only justification for not interviewing them is that he was "aware" that the community in which Marshall lived had turned against him in the time preceding and during the trial. Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 80, l. 21–23; 83–84; 198, l. 8–15; 204–207. This explanation is wholly unreasonable. There is absolutely nothing to suggest that because community sentiment was against Marshall, individuals within that community would not testify on his behalf. Therefore, we are persuaded that Zeitz's decision not to conduct targeted interviews or discussions with any potential penalty phase witnesses was unreasonable and constitutes deficient representation under *Strickland.*

▇▇▇ Petitioner also asserts that Zeitz's lack of investigation is evidenced in his failure to obtain records or documentary evidence of Marshall's charitable activities. We find this argument less compelling. Petitioner argues that it was unreasonable for Zeitz to fail to contact the United Way to gather documentation of Marshall's involvement with that organization when Zeitz was aware of Marshall's fund-raising. *See* Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 90, l. 16–20 (testifying that he never contacted anyone at the United Way to obtain documents or any other records regarding Marshall's participation with the group's activities). However, on this point, we are satisfied that Zeitz acted reasonably. Zeitz elicited testimony from Marshall during the guilt phase that briefly described Marshall's involvement with the United Way. Post–Evidentiary Hr'g App. Resp't at 65, Test. of Robert Marshall (stating that he was involved in the Tom's River Rotary, local business associations, the YMCA, and the United Way as the fundraising chairman in 1982–83). Zeitz then reminded the jury of that testimony at the penalty phase. Although we find Marshall's testimony on this point extremely limited (comprising less than a paragraph of the trial transcript and introduced as basic background information) we are unwilling to say that Zeitz did not make a tactical decision to remind the jury of Marshall's testimony and expect that they would take it into account rather than to present a series of documents or records to catalogue Marshall's charitable contributions.

▇▇▇ Petitioner next claims that Zeitz's preparation for the penalty phase was constitutionally deficient because Zeitz failed to consult with Marshall. In *Strickland,* the Supreme Court clearly stated that among counsel's basic duties is the obligation to "function as an assistant to the defendant … to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *see also Lewis v. Johnson,* 359 F.3d 646, 660–61 (3d Cir.2004). The decision about how to proceed as to a penalty phase of a capital trial is clearly one such important decision. Further, "[b]ecause the reasonableness of counsel's acts (including what investigations are reasonable) depends 'critically' upon 'information supplied by the [petitioner]' or 'the [petitioner's] own statements or actions,' evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims." *Chandler,* 218 F.3d at 1318 (citing *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052). Without sufficient consultation, a defendant cannot make informed decisions about how to proceed with a case for life nor can he provide counsel with family or medical history, contact information for potentially helpful witnesses or any other mitigating information. Marshall testified that prior to the guilty verdict, he and Zeitz never specifically discussed the possibility, structure, or procedure of a penalty phase. Tr. Sept. 9, 2003, Test. of Robert Marshall at 5, l. 12–

16; 7, l. 9–15; 15, l. 11 to 17, l. 15.[47] Further, Zeitz did not explain to Marshall that he had the right to allocate at the penalty phase. Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 114, l. 8–14 (stating that he told Marshall he had the right to speak to the jury, but couched it in terms of testifying, rather than clearly explaining that Marshall had the right to make an unsworn statement asking for mercy); *see also* Tr. Sept. 9, 2003, Test. of Robert Marshall at 30, l. 12 to 31, l. 10; 123, l. 17–25 to 124, l. 1–4 [48] (indicating additionally that had he known of his right to allocute he would have asked the jury to spare his life so as "not to make orphans out of my sons").

There is little doubt that Zeitz never had a specific or definitive conversation about strategy, evidence, or witnesses for the penalty phase with Marshall prior to Marshall's return from the hospital on May 5, 1986. *Marshall V,* 307 F.3d at 102 (noting that in the thirty pages of notes Zeitz produced for the period between December 1984 and January 1986, "there is no reference to any discussion of the penalty phase"); Tr. Sept. 9, 2003, Test. of Robert Marshall at 7, l. 13–15 (stating that Zeitz continually reassured him that he would not be convicted and not to worry about anything, but never discussed the penalty phase with him). When Zeitz did confer with his client, the conversation took less than 15 minutes, was conducted in the wake of the devastating guilty verdict coupled with a medical incident, and focused on presenting an agreement to Marshall that Zeitz had "extracted" without doing any investigation into a mitigation case. We find that this perfunctory communication falls far short of the type of consultation necessary to satisfy *Strickland's* mandate or the Sixth Amendment.

■ Finally, Petitioner contends that Zeitz improperly permitted the penalty phase to commence a mere two hours after the guilty verdict was rendered. Although Marshall was physically and emotionally fit to proceed with the penalty phase, *see Marshall IV,* 103 F.Supp.2d at 791 (citing the post-conviction relief hearing finding that despite Marshall's fainting spell, he was fit to proceed), by not requesting a continuance Zeitz was forced to go forward without having conducted any investigation into a case for life. We are convinced that no reasonable attorney in Zeitz's position would have gone forward without an adjournment.[49] Zeitz did not have a single

**47.** In fact, Marshall testified that any knowledge he had about the structure of a penalty phase he obtained from other inmates while he was incarcerated during his trial. Tr. Sept. 9, 2003, Test. of Robert Marshall at 121, l. 7 to 122, l. 6.

**48.** During his direct testimony, Marshall and the Court had the following exchange:

THE COURT:
Let me stop there for a minute. At any time after the verdict came in, did Mr. Zeitz ask you if you wanted to address the jury? Let's forget the word "allocute." Did you want to talk to the jury on your behalf during the death penalty phase? Did he ask you that?
THE WITNESS:
No sir, he didn't.
THE COURT:

At any time before the verdict came in, did he ask you if you wanted to do that?
THE WITNESS:
No, sir.
THE COURT:
Okay. Did the judge ask you?
THE WITNESS:
No, sir.

**49.** In addition to gaining time to conduct an investigation, such a delay would have given not only the jury an opportunity to distance itself from its verdict, but also Zeitz and his client time to consult and regroup. *See* Tr. Sept. 10, 2003, Test. of Carl Herman at 37–39 (discussing the importance of a continuance after a jury verdict not only because a jury who has just found a defendant guilty is likely "not in a forgiving mood," but also because there is no "downside" to the request).

witness ready to testify, nor was he aware of any useful mitigating evidence aside from a cursory understanding of Marshall's charitable work and the fact that he had no prior criminal record. Zeitz's decision to move forward also ensured that Marshall's family would not be present during the proceedings because Marshall's sister Oakleigh had taken John and other family members home earlier in the day, mistakenly believing that the penalty phase would not start that afternoon. This situation is entirely different than that of *United States v. Lewis,* 786 F.2d 1278, 1283 (5th Cir.1986), in which the Fifth Circuit held that counsel's decision not to request a continuance was not ineffective where there was no showing that new evidence would have been found that would have had any effect on the trial. Here, however, a continuance would have permitted Zeitz to discover a substantial number of willing witnesses, including family members who could have testified on Marshall's behalf. Therefore, a continuance was absolutely necessary in this case and Zeitz acted unreasonably by not requesting one.

 Although we find Zeitz's representation deficient based on his lack of pre-penalty phase investigation, we are sensitive to the fact that Marshall may well have constrained Zeitz's ability to pursue mitigation evidence while the guilt phase of the trial was ongoing. *See* Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 44, l. 8–13.[50] It is clear that Marshall was and is a strong-willed[51] and challenging client who, despite his claims to the contrary, restricted Zeitz's ability to raise the possibility that he would be found guilty with members of the Toms River community or Marshall's family.[52] *Id.; see also* Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 50, l. 21 to 51, l. 14 (indicating that Zeitz found Marshall to be a "difficult client to control" from the earliest stages of their relationship). However, the fact that Marshall put up barriers to discussions of a penalty phase does nothing to relieve Zeitz of his constitutional duty as an attorney. *Strickland* permits attorneys to curtail or limit their investigations where "a defendant has given counsel reason to believe that pursuing certain investigations would be *fruitless or even harmful.*" 466 U.S. at 691, 104 S.Ct. 2052 (emphasis added). "But where a client is [merely] recalcitrant, courts have been ambivalent in whether counsel is relieved of *any* further duty of investigation." *Marshall V,* 307 F.3d at 103 (emphasis in the original); *see also Coleman v. Mitchell,* 268 F.3d 417, 449–450 (6th Cir.2001) (finding that "defendant resistance to disclosure of information does not excuse counsel's duty to independently investigate"); *Emerson v.*

---

**50.** Zeitz made it clear in his testimony that he felt constrained by Marshall's insistence "during the entire course of my representation, that I not say or do anything with the children, with family members, that in any way, shape or form would indicate that I had anything other than complete belief in his innocence." Tr. Sept. 3, 2003 at 44, l. 8–13; 42, l. 16–19 (stating that Marshall wanted him to "be very careful in the way I conducted myself with his family members"). Zeitz indicated that he conducted his representation "in order to honor [Marshall's] feelings." *Id.* at 44, l.21–25. Zeitz also stated that he felt there was no way to talk to Marshall's sons about

the possibility of a penalty phase without violating Marshall's dictates. *Id.* at 45, l. 3–16.

**51.** Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 55, l. 9–13 (describing Marshall as a strong-willed, educated and articulate client who was "firm in his position he had done nothing wrong, and he didn't want anything other than one hundred percent loyalty from anybody").

**52.** In contrast to Zeitz's testimony, Marshall testified that he never put any restrictions on Zeitz with regards to his ability to talk to family members. Tr. Sept. 9, 2003 at 19, l. 12–22.

*Gramley,* 91 F.3d 898, 906–907 (7th Cir. 1996). Here, Marshall neither did nor said anything to suggest to Zeitz that discussions with either his sons or his other family members would be fruitless or harmful to a case for life. Marshall only insisted that those around him focus on a denial defense. Even when clients strongly assert their innocence and refuse to discuss the possibility of being found guilty, an attorney must find a way to prepare for and investigate a mitigation case. *See* Tr. Sept. 10, 2003, Test. of Carl Herman at 40, l. 13–15 (stating that "it was very clear in the early 80's that perhaps the most important thing you could do in a death penalty case is prepare for the penalty phase").[53] This is particularly true, when, as here, the prosecution's case is "weighty and compelling." *Marshall I,* 586 A.2d at 97; *see also* Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 84, l. 11; 199, l. 19 to 200, l. 1 (stating that "[t]he State had a very strong case" and agreeing with the statement that a strong case for the prosecution "simply highlights or underscores the need for an exhaustive preparation for the penalty phase"). No matter how difficult, Zeitz had an obligation either to convince Marshall to cooperate with him in preparing a case for life, or to find a way

to conduct an investigation without Marshall's assistance.[54] *See* Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 46, l. 13 to 47, l. 20; 52, l. 8–20 (indicating that he recognized an attorney's obligation to prepare and present a mitigation case, regardless of his client's wishes).

Even if this Court assumes, for the sake of argument only, that Zeitz was so hampered by Marshall's dictates that he could not fulfill his professional duty to prepare a mitigation case prior to the end of the guilt phase, once the jury rendered a guilty verdict, the entire tenor of the case changed. The case was no longer one of proving innocence, rather, it was a case for life. At this point, given the inordinately high stakes, Zeitz had an obligation to request a continuance and conduct a penalty phase investigation, no matter how obstreperous or difficult his client had proven to be in the past. We can discern no reasonable explanation for a decision not to investigate at that point.

Zeitz contends that, although he had not conducted a specific penalty phase investigation, he had sufficient information from his preparation for the guilt phase to make a decision to move forward with the penalty phase. Zeitz claims throughout his tes-

---

**53.** Where the client has family members available to the defense, that preparation, at the very least, requires that counsel

have a conversation with the family early on, where you sit down .. and say ... I'm representing your [family member], he's in a tough spot, we're going to fight this case; he says he's not guilty, that's our plea, we're going to trial, we're not going to give up. But you have to understand New Jersey now has a death penalty, and maybe you don't know that because, you know, it's new, but your [relative] is in danger of being executed if things don't go right here; and I don't want to talk to you about it, but I have to talk to you about it, because I'm not doing my job unless I talk to you about it. And I'm going to talk to your [relative] about it, and you and I, you got to tell me

how you feel about your [relative], you got to tell me what you're prepared to say; come up with some memories; come up with some feelings, you know. that type of thing.

Tr. Sept. 10, 2003, Test. of Carl Herman at 40–41.

**54.** *See* Tr. Sept. 10, 2003, Test. of Carl Herman at 43–44 (stating that even where a client is against the preparation of a mitigation case, "it's difficult, but it can be done. I mean I've done it and other lawyers have done it. It's more difficult when you have a client who's basically saying, you know, free me or try me .... [but] you got to work through that. You got to talk to them about it, or you got to—you know, what we did was we hired mitigation experts").

timony that he gathered sufficient information from Oakleigh DeCarlo, conversations with Marshall, and Kolins' investigation for the guilt phase to: (1) craft a strategy for the penalty phase; and (2) present and argue a case for life. *See, e.g.,* Tr. Sept. 3, 2003, Test. of Glenn Zeitz at 40, l. 18–22. Specifically, Zeitz argues that he chose not to present evidence of Marshall's educational background, family obligations and relationships or his involvement in civic and charitable activities because it had already been presented to the jury during the trial. Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 99, l. 19 to 100, l. 25; *Marshall I,* 586 A.2d at 168.

However, we reject not only Zeitz's argument that he conducted an investigation sufficient to permit him to argue that his decisions at the penalty phase were strategic, but also Zeitz's argument that he introduced substantial mitigation evidence in the guilt phase. The purpose of the penalty phase of a trial is to provide the jury with information that permits it to make an "individualized sentencing determination ... [based on] the character and record of the individual offender and the circumstances of the particular offense." *Penry v. Lynaugh,* 492 U.S. 302, 316, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (internal citations omitted). Although the New Jersey Supreme Court found that "several defense witnesses at trial provided testimony about petitioner's good reputation in the community and petitioner, himself, testified about 'his background, education, family life, and civic activities,'" *Marshall IV,* 103 F.Supp.2d at 791 (citing *Marshall I,* 586 A.2d at 172), the scope of that testimony is limited at best. The character witnesses to whom the New Jersey Supreme Court refers: Gerald Hughes,

Henry Tamburin, Thomas Fenwick, and Lynn Fenwick, provided only general statements regarding Marshall's reputation as a law abiding citizen and an honest man.[55] *See Marshall V,* 307 F.3d at 98. Marshall's testimony regarding his background was equally cursory. Pet. Appendix at 37–45, Guilt–Phase Test. of Robert Marshall (briefly discussing his family history, education, employment and community involvement).

Zeitz's reliance on the testimony of John, Chris and Robby Marshall for a showing that he introduced strong mitigating evidence in the guilt phase is equally misplaced. Their testimony was limited to statements describing how their father sounded during individual phone calls made on the night of September 27, 1984. Neither Robby, nor Chris nor John Marshall ever testified as to their relationship with or feelings toward their father, his involvement in their lives, the harm his execution would cause, or their desire for the jury to spare his life. It was only in the evidentiary hearing before this Court that John Marshall, now 32 years old, had the opportunity to testify about how important his father was and is to him, the relationship he had with his father at the time of the trial, the relationship he has continued to have with Marshall, and what he would have said if asked to testify as a mitigation witness.

Ultimately, our review of Zeitz's conduct regarding his preparation for the penalty phase compels us to find that his representation was unreasonable under prevailing professional norms in 1986. The Court is satisfied that, at a bare minimum, Zeitz was required to have specific discussions with Marshall and his family members about the possibility of a penalty phase,

---

**55.** For example, Gerald Hughes testified only that Marshall had a reputation as a law abiding, honest professional and an upstanding businessman. Pet.App. at 29–30. Thomas and Lynn Fenwick testified that Marshall had a reputation for being a lawabiding citizen and an honest man. *Id.* at 48.

what a penalty phase entails and a discussion with each person individually as to whether he or she would have been willing to testify and what he or she would have said. By failing to conduct any targeted investigation into potentially mitigating factors and neglecting to consult with his client, Zeitz failed to conduct himself as a reasonable attorney would. Thus, we find that the New Jersey Supreme Court's decision that Zeitz engaged in adequate investigation, consultation and preparation for the penalty phase was an unreasonable application of Supreme Court precedent as articulated in *Strickland.*

**b.**

■ With the understanding that Zeitz's failure to investigate a mitigation defense permeates and underlies all aspects of the penalty phase, we now turn to an examination of Petitioner's remaining claims, which challenge the substance of the mitigation case presented by Zeitz. Specifically, Petitioner claims Zeitz's representation was constitutionally deficient because Zeitz failed to introduce mitigating evidence, failed to humanize Marshall to the jury and failed to make a plea for his client's life. Because Zeitz did not engage in a reasonable investigation prior to the penalty phase, his subsequent decisions do not enjoy the same deference as decisions made after proper investigation and preparation. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052; *Wiggins,* 123 S.Ct. at 2535–2539.

■ Petitioner first contends that Zeitz's representation is unreasonable because he introduced no mitigating evidence

in the penalty phase and, thus, failed to humanize his client.[56] However, "[n]o absolute duty exists to introduce mitigating or character evidence." *Chandler,* 218 F.3d at 1319; *see also Burger,* 483 U.S. at 789–796, 107 S.Ct. 3114; *Darden,* 477 U.S. at 185–87, 106 S.Ct. 2464; *Waters,* 46 F.3d at 1511; *Stouffer v. Reynolds,* 168 F.3d 1155, 1167 (10th Cir.1999) (allowing that the "decision to present no mitigating evidence may be a tactical one"); *Morales v. Coyle,* 98 F.Supp.2d 849, 869 (N.D.Ohio 2000). Under existing case law, "the key to the findings of ineffectiveness [is] not that mitigating evidence was not presented, but that counsel, as a result of inadequate preparation, had failed to discover the evidence." *Laws v. Armontrout,* 863 F.2d 1377, 1384–85 (8th Cir.1988); *see also Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052 (stating that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations of the investigation"); *Darden,* 477 U.S. at 184–87, 106 S.Ct. 2464; *Burger,* 483 U.S. at 789–96, 107 S.Ct. 3114; *Stouffer,* 168 F.3d at 1167; *Morales,* 98 F.Supp.2d at 870. This is not a case where, after reasonable investigation, Zeitz determined that it was tactically a better choice not to put on a mitigation case.[57] Rather, it is a situation where Zeitz inadequately prepared for the penalty phase and put on no mitigating evidence because he had none to present. Zeitz only provided the jury with a stipulation that Marshall had no prior criminal record and an embarrassingly superficial mention of Marshall's charity work.[58] Therefore,

**56.** Although the Third Circuit separated this contention into two separate claims, we are satisfied that the failure to present any mitigating evidence and the failure to humanize Marshall are part and parcel of the same issue.

**57.** *See e.g., Deputy v. Taylor,* 19 F.3d 1485, 1493–1495 (3d Cir.1994)(affirming petition-

er's conviction and death sentence where counsel decided not to present testimony of defendant's family members and counselors because it added little to what was already in evidence in the form of psychiatric reports).

**58.** Zeitz did introduce some arguably humanizing evidence during the guilt phase of the trial, specifically, the three audio tapes Mar-

Zeitz's decision was not a reasonable strategic choice, but an abdication of his constitutional duty. Nothing in the record provides a reasonable professional justification to support a decision not to present a case for life.[59]

■■■■■ Lastly, Petitioner claims that Zeitz acted unreasonably by failing to plea for Marshall's life. Again, there is no *per se* rule requiring counsel to make a mercy plea to the jury. *See Strickland,* 466 U.S. at 688, 104 S.Ct. 2052 (refusing to adopt *per se* rules for determining what is reasonable representation); *Bell,* 535 U.S. at 701, 122 S.Ct. 1843 (rejecting an ineffective assistance of counsel claim based in part on counsel's failure to make a plea for his client's life); *Chandler,* 218 F.3d at 1317 (stating that "no absolute rules dictate what is reasonable performance for lawyers"); *Romero v. Lynaugh,* 884 F.2d 871, 875–77 (5th Cir.1989) (affirming the district court's decision that counsel's brief penalty phase closing argument which did not include a plea for his client's life was not deficient where counsel was prepared

for and involved in all aspects of the trial and provided the jurors with mitigating evidence); *Marshall I,* 586 A.2d at 173 (noting that what constitutes an effective closing argument in a capital case "depends on the crime, the evidence, the circumstances—in short, the entire record"). However, given the complete lack of investigation prior to the penalty phase and Zeitz's limited and cursory closing statement, Zeitz's decision not to ask the jury to spare his client's life seems incomprehensible. Tr. Sept. 10, 2003, Test. of Carl Herman at 68, l. 17–19.[60]

The penalty phase exists to give counsel the opportunity to humanize his client, to show a jury that, despite its belief in his guilt, they should spare his life. *See Marshall V,* 307 F.3d at 103. Where there is little else on the defendant's side, all counsel has is a final plea for mercy. Rather than plea for his client's life, however, Zeitz told a jury which had just found his client guilty two hours earlier: "All I can say is this, that I hope when you individually consider the death penalty, that you're

---

shall recorded for his sons on the day of his suicide attempt. Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 89, l. 1–15. In the tapes, Marshall told his sons how much he loved them, apologized for leaving them and encouraged them to be successful. *See* Def. Ex. 4. The tapes, however, while they may show that Marshall loved his sons, did not reveal how his sons felt about him. Further, even though Zeitz introduced the tapes, he failed to mention them during his penalty phase closing.

**59.** Zeitz suggests that his fears of "opening doors to damaging rebuttal evidence" motivated, in part, his decision not to put on any mitigation witnesses. Tr. Sept. 4, 2003, Test. of Glenn Zeitz at 196, l. 10–24. However, Zeitz admits that, at the time of the penalty phase, he was not aware of any specific rebuttal evidence that the State had. *Id.* at 224, l. 10 to 226, l. 24. Zeitz further acknowledged that had the parties not agreed to truncate the penalty phase, the State would have been obligated to turn over all its rebuttal evidence

prior to the hearing, permitting Zeitz to alter his planned presentation to avoid damaging testimony. *Id.* Thus, we are unconvinced that Zeitz's motivation was reasonable and reject the finding of the New Jersey Supreme Court that Zeitz's decision to give only a brief closing statement was "formulated in anticipation of the State's response" and that Zeitz strategically chose to not make too much of an emotional appeal. *Marshall IV,* 103 F.Supp.2d at 793 (citing *Marshall I,* 586 A.2d at 172–73).

**60.** Indeed, Carl Herman testified that he thought "one of the important disturbing aspects of this case is that, you know, in terms of investigation, preparation, presentation and argument, I've never heard—never heard of a lawyer [except Zeitz] not asking a jury to spare their client's life. It would be like doing a summation in a guilt phase, where you said, you know, you've heard the evidence, ladies and gentlemen, you figure this case out; I can't—whatever you do is fine." Tr. Sept. 10, 2003, Test. of Carl Herman at 68, l. 15–22.

each able to reach whatever opinion you find in your own heart, and that whatever you feel is the just thing to do, we can live with it." We cannot characterize this "verbal shrug of the shoulders" as advocacy, much less find it reasonable representation in the context of a capital murder trial. *Marshall V*, 307 F.3d at 101. Given the absence of any genuine mitigating evidence in the guilt phase and defense counsel's superficial and perfunctory closing statement in the penalty phase, the Court is persuaded that Zeitz's decision not to plead for Marshall's life was unreasonable.[61] Ultimately, Zeitz's performance in the penalty hearing of Marshall's capital murder trial was unreasonable under prevailing professional norms in 1986, and, thus, constitutionally deficient under the Supreme Court's holding in *Strickland*.

## C.

■■■■ Our finding that counsel's performance was deficient according to the prevailing professional norms for capital defense in 1986, however, does not end our review. We must now ascertain whether Petitioner was prejudiced by Zeitz's actions or inactions. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. "An error by counsel, if professionally unreasonable does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052; *see also Wiggins*, 123 S.Ct. at 2542.

■■■ In New Jersey capital cases, [t]he application of the second prong of *Strickland*—the prejudice prong—has a somewhat more subtle application in the penalty phase than in the guilt phase [because New Jersey is a] 'weighing' state.... Given the unanimity requirement, the 'reasonable probability of a

---

**61.** We distinguish Zeitz's performance from that of defense counsel in *Romero*, 884 F.2d at 875. In *Romero*, counsel's closing statement to the jury was limited to the following:

> Defense Counsel: I appreciate the time you took deliberating and the thought you put into this. I'm going to be extremely brief. I have a reputation for not being brief. Jesse, stand up. Jesse?
> The Defendant: Sir?
> Defense counsel: Stand up. You are an extremely intelligent jury. You've got that man's life in your hands. You can take it or not. That's all I have to say. *Id.*

In *Romero*, the Fifth Circuit rejected the defendant's ineffective assistance of counsel claim, noting that defense counsel engaged in "substantial preparation for trial ... [and] there is nothing to suggest that any mitigating facts were not before the jury." *Id.* at 877. The *Romero* decision highlights the deference afforded strategic decisions made after thorough investigation. In the instant matter, however, defense counsel engaged in no investigation into mitigation factors. Therefore, his decisions at the sentencing hearing, such as it was, are not entitled to the same deference. Had Zeitz investigated and prepared fully for both phases of Marshall's capital trial, we would be in accord with the New Jersey Supreme Court's finding that "[i]n the context of this record and the grave offense of which defendant was convicted, a closing argument that focused each juror's attention on his or her moral responsibility for defendant's life or death cannot easily be discredited." *Marshall I*, 586 A.2d at 173. Given Zeitz's decision not to investigate, however, we find his later decision to limit his closing as he did unreasonable. *See, e.g., Dobbs v. Turpin*, 142 F.3d 1383, 1387–1389 (11th Cir.1998) (finding counsel ineffective where he failed to investigate prior to the penalty phase and made a closing argument that did not include a mercy plea, but rather told a jury "to impose a sentence with which they could live"); *Horton v. Zant*, 941 F.2d 1449, 1462–63 (11th Cir.1991) (finding defense counsel ineffective where counsel did little investigation in preparation for the penalty phase and told the jury "Maybe [defendant] ought to die, but I don't know" rather than making a plea for his client's life).

different outcome' would mean that only one juror need weight the factors differently and find that the aggravating factor did not outweigh the two mitigating factors; even if the aggravating and mitigating factors were of equal weight, under New Jersey's sentencing scheme, the sentence would be life in prison, not death. *Marshall V*, 307 F.3d at 103–104; N.J. Stat. Ann. § 2C: 11–3c(3).[62] Thus, Petitioner need only show that there is a reasonable probability that one juror would have found that the aggravating factor failed to outweigh the mitigating factors in order to show prejudice under *Strickland.*

We are satisfied that Petitioner has met his burden to show he was prejudiced by Zeitz's performance. Here, not only did "Zeitz ramble[ ] his way through the mitigating factors ... not[ing] only sparse facts, eschewing the notion of going 'through a whole litany' in favor of merely characterizing it as a 'substantial record,'" *Marshall V*, 307 F.3d at 99–100, but he also failed to investigate or present a significant amount of mitigating evidence. Had competent counsel investigated and presented even a portion of this evidence, there is a reasonable likelihood that the

jury would have returned a life sentence. At the time of the sentencing phase of Marshall's trial, counsel had access to a pool of at least sixteen potential witnesses including one of Marshall's sons, his siblings, friends, neighbors, and clergy who were willing and able to testify on Marshall's behalf. Among those were several close family members and friends who would have asked the jury to spare Marshall's life and would have testified to the harmful impact Marshall's execution would have on his family, particularly his then fifteen-year-old son John.[63] We find it hard to imagine that testimony from, at the very least, Marshall's son and siblings, would not have affected the jury. The type of powerful and emotional testimony likely to have been given by Marshall's family is of a wholly different magnitude than Zeitz's sterile allusions to Marshall's community involvement and prior lawabiding life. Indeed, given that Marshall need have only persuaded one juror that the aggravating factor did not outweigh the likely harm to his family, we are satisfied that there is a reasonable probability that the outcome of the penalty phase would have been different had Zeitz conducted a constitutionally sufficient investigation into

62. N.J. Stat. Ann. § 2C:11–3c(3) provides:

The jury or, if there is no jury, the court shall return a special verdict setting forth in writing the existence or nonexistence of each of the aggravating and mitigating factors set forth in paragraphs (4) and (5) of this subsection. If any aggravating factor is found to exist, the verdict shall also state whether it outweighs beyond a reasonable doubt any one or more mitigating factors.

63. We reject the State's contention that the mitigating evidence available to Zeitz could not have swayed a jury to spare Marshall's life because it was insufficiently "powerful" or "compelling" and did not present a history of childhood trauma, horrific past abuse, or emotional or psychological deficits. *See* Post-Evidentiary Hr'g Br. Behalf Resp't at 59–64. Although such evidence is, indeed, powerful,

nothing in the case law suggests that a defendant without such a troubled past cannot satisfy the prejudice prong, nor that different types of evidence cannot be mitigating. *See, e.g., Williams*, 529 U.S. at 396, 120 S.Ct. 1495 (describing as mitigating both records of intellectual deficiencies and limited educational achievement and testimony as to defendant's commendations received in prison for help in breaking a drug ring and success in adapting to prison life); *Groseclose v. Bell*, 130 F.3d 1161, 1169–1170 (6th Cir.1997) (including in potentially mitigating evidence defendant's church involvement, positive military record, and the "plethora of family members willing to testify on his behalf" and finding that counsel's "utter failure to develop or even advert to these mitigating factors" gave rise to a finding of prejudice under *Strickland* ).

and presentation of a case for life.[64] *See Williams*, 529 U.S. at 396, 120 S.Ct. 1495 (finding counsel's failure to investigate the existence of "voluminous" additional mitigation evidence prejudicial to defendant under *Strickland* ); *see also Jermyn*, 266 F.3d at 311 (finding "the fact that counsel presented some mitigating evidence of a different nature and quality seems largely beside the point, given the significance of the evidence that was omitted and the reasonable likelihood that the totality of the available mitigating evidence ... might have lead to a different result"); *Groseclose v. Bell*, 130 F.3d 1161, 1169– 1170 (6th Cir.1997); *Collier v. Turpin*, 177 F.3d 1184, 1201 (11th Cir.1999). Thus, the New Jersey Supreme Court's determination that Marshall failed to show prejudice under *Strickland* was an unreasonable application of *Strickland*. *See Marshall III*, 690 A.2d at 82.

Ultimately, Petitioner has satisfied his burden to show both that his counsel's representation was deficient under prevailing professional norms and that he was prejudiced by counsel's incompetence. The Court has no confidence that the penalty phase of Marshall's trial was a genuine adversarial proceeding, the assurance of which is at the very heart of the right to counsel under the Sixth Amendment. Therefore, we find the New Jersey Supreme Court's determination that counsel was effective an unreasonable application of *Strickland*.

## V.

For the reasons set forth above, this Court will grant Petitioner's application for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the ground that he was denied effective assistance of counsel at the sentencing phase of his criminal trial. Additionally, the Court will vacate Petitioner's death sentence and remand to the state court for a new sentencing hearing to be held within 120 days unless such date is extended by further order of the Court.[65] The Court will issue an appropriate order.

---

**64.** As Justice O'Hern, of the New Jersey Supreme Court noted, "deciding whether a man shall live or die is not the product of building blocks of evidence ... capital sentencing is ineluctably individualistic." *Marshall I*, 586 A.2d at 199 (O'Hern, J., concurring in part and dissenting in part); *see also Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9th Cir.1995) (noting that the penalty phase of a capital case "is not an ordinary legal determination which turns on the establishment of hard facts. The statutory factors give the jury broad latitude to consider amorphous human factors, in effect, to weigh the worth of one's life against his culpability").

**65.** In remanding this matter for resentencing, the Court takes no position on the propriety of conducting a new penalty phase eighteen years after the first. Thus, the Court leaves to the state court any decision on any questions of law that may be raised by conducting a new hearing.