CRAWFORD, Judge
(dissenting):
I respectfully dissent from the action of the majority ordering a hearing in this case under United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967), because, in so doing, the majority ignores both the facts that have already been “salted down” in the record of trial as well as this Court’s previous review of those facts. Neither the facts nor the legal standards applicable to the facts have changed since this Court, on direct appeal in 1994, thoroughly reviewed Petitioner’s allegations of ineffectiveness of counsel under the standards set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), did not change the Strickland standard, and in any event, Wiggins is clearly distinguishable from this case. Just as they were in 1994, the facts are present in the record of trial[1] without resorting to a DuBay hearing to decide the Strickland issue. I must then ask the question, what other than the personnel at this Court, has changed since 1994?
I. STANDARD OF REVIEW
If a petitioner was given full and fair consideration to each of his claims on a standard that has remained unchanged, the petitioner is not entitled further review of the same issue. “[W]hen a military decision has dealt fully and fairly with an allegation raised in that application, it is not open to a federal civil court to grant the writ simply to reevaluate the evidence.” Burns v. Wilson, 346 U.S. 137, 142, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953) (citation omitted). In this case, counsel had every reasonable condition and tool to raise the issue of effectiveness of counsel during the action by the convening authority. Such motion raised to the convening authority then would be “ruled upon by the same ... judge who presided at trial.” *162 Massaro v. United States, 538 U.S. 500, 506, 123 S.Ct. 1690 (2003). That “judge, having observed the earlier trial, should have an advantageous prospective for determining the effectiveness of counsel’s conduct and whether any deficiencies were prejudicial.” Id. After that stage, counsel representing Petitioner, the same counsel present on this appeal, years later[2] was not hesitant to raise issues concerning the performance of trial defense counsel and presents no evidence of being in “an awkward position in vis-a-vis trial [defense] counsel.” Id.[3] Thus, Petitioner’s counsel could be assured the facts, on a common issue — not a novel issue, were correctly found and applied during our direct review of this case.[4] We should not repeat the process we have already carefully performed by reviewing this issue again. This Court’s prior decision is and should be considered final.
Federal statutes also limit other circuit courts’ review of habeas corpus claims where the same issue was litigated on direct appeal. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d)(2000), which is persuasive authority, provides that a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in the state court proceedings unless the adjudication of the claim resulted in a decision that was: (1) contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. The “unreasonable application” prong permits a federal habeas corpus court to grant the writ if the state court identifies the correct governing legal principle from the Supreme Court’s decisions, but unreasonably applies that principle to the facts of a petitioner’s case.
This Court, on direct appeal, adjudicated Petitioner’s claim that his trial defense counsel were ineffective for failing reasonably to investigate his background for mitigation evidence. In evaluating that claim, we applied the standard established in Strickland, the same standard applied in Wiggins and the same standard applied to such claims today. In accordance with 28 U.S.C. § 2254(d), habeas review of this issue is barred unless this Court’s decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States ... [or] ... was based on an unreasonable determination of the facts in light of the evidence presented in the [original] proceeding.” 28 U.S.C. § 2254(d)(1) and (2). Since this Court reviewed the issue of ineffective assistance of counsel,[5] including the “reasonableness” of trial defense counsel’s investigation on direct review and applied the appropriate standard set out in Strickland, AEDPA bars further review of this issue.
In addition, the law of the case doctrine and the doctrine of finality preclude review of the issues raised by Petitioner. To allow unlimited extraordinary writs would be an abuse of discretion. “The interest in finality of judgments dictates that the standard for a successful collateral attack on a conviction be more stringent than the standard applicable on a direct appeal.” United States v. Stone- *163 man, 870 F.2d 102, 103 (3d Cir.1989). This ease demonstrates the need for finality.
II. THE ISSUE AND FACTS REGARDING THE INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM WERE ADDRESSED ON DIRECT APPEAL.
The majority concludes that “in light of’ Wiggins, it does “not have the factual predicate to determine if our prior decision addressing the issue of ineffective assistance of counsel is correct.” The majority, however, notes that Wiggins “applied the ‘clearly established’ precedent of Strickland v. Washington” and then cites Wiggins, citing Strickland, for the proposition that “defense counsel has a fundamental duty to perform a reasonable investigation.”
Wiggins cites Strickland throughout the opinion and never establishes any new rules.[6] Wiggins is a fact-based decision and did not change the law with regard to evaluating ineffective assistance of counsel claims. Those courts which have addressed or applied Wiggins have recognized this and have distinguished Wiggins.[7] The majority, however, attempts to make something out of Wiggins which was never intended by the Supreme Court.
Wiggins addresses a state court’s misapplication of the Strickland standard. 539 U.S. at 551, 123 S.Ct. 2527. It did not modify the Supreme Court’s interpretation of Strickland. In this case, the majority is now holding that this Court “did not focus on the investigative aspects leading to defense counsel’s tactical decision in sentencing” when reviewing the case on direct appeal, even though this Court found that defense counsel “made reasonable tactical decisions related to the sentencing proceeding.” I believe that on direct appeal, this Court did evaluate the reasonableness of the defense counsel’s investigation. The evidence necessary to make such evaluation was before this Court at the time in the record itself, as well as in the numerous affidavits submitted as appellate exhibits from the three trial defense counsel.[8] The affidavits and documents that the majority relies on to conclude there was “powerful mitigating evidence” which was not investigated were before this Court on direct appeal, including the testimony of the family members and acquaintances at trial.[9]
III. EXAMINING THE FACTS UNDER STRICKLAND AND WIGGINS
These facts were “salted” away in the record of trial, and the appellate exhibits reveal *164 what actions were taken and the thought processes of trial defense counsel in this case. The record shows the numerous witnesses and evidentiary exhibits that were presented by the defense during the sentencing hearing and significantly, what evidence trial defense counsel and their forensic psychiatrist evaluated, considered, and discussed among themselves and with Petitioner before deciding on a strategy and what evidence actually to present and not present on the merits and during sentencing.
Investigation of Petitioner’s Background
In this case, trial defense counsel visited Petitioner’s hometown.[10] They interviewed family members, teachers, friends, acquaintances, and reviewed school records. They interviewed members of Petitioner’s unit and Petitioner. Trial defense counsel did conduct an investigation and then ultimately presented testimony and documents that this investigation yielded at trial.[11]
Investigation of Petitioner’s Physiological and Psychological Background
The defense considered and inquired about potential physiological reasons, such as a pri- or head injury or brain abnormality, to explain or mitigate Petitioner’s actions. The defense had at their disposal a sanity board and a forensic psychiatrist. Dr. David Armitage is a forensic psychiatrist who holds professional degrees in medicine and law.[12] He was the Associate Chairman for Forensic Science and Litigation Support, Department of Legal Medicine, Armed Forces Institute of Pathology, Washington, D.C., and Consultant Emeritus to the Surgeon General of the Army on Forensic Psychiatry. Loving, 41 M.J. at 240. He was part of the defense team and thus his tests, evaluations, and advice were covered and protected by the attorney-client privilege.
In their affidavits, trial defense counsel discussed Dr. Armitage’s extensive involvement and participation in the preparation and trial of this case. Dr. Armitage met “extensively with Private Loving, and [trial defense counsel] obtained all the psychological and medical testing Dr. Armitage needed to provide the [defense] a proper evaluation of the case from his perspective.”[13]
Investigation of Petitioner’s Alcohol and Drug Use
The defense also considered whether to present a partial mental responsibility defense or diminished capacity defense based on alcohol and drug intoxication. The defense was aware of Petitioner’s history of drug and alcohol use, to include his claim of ingesting alcohol, cocaine, and marijuana or hashish before and during the crime spree. Considering the circumstances surrounding the two robberies, the two murder/robberies, and the attempted murder/robbery, as well as Petitioner’s detailed recall of the events without remorse to law enforcement shortly after the crimes, attempts to show Petitioner was drunk or drugged or his actions were the *165 result of some kind of diminished capacity were not feasible and fraught with potential risk.
Trial defense counsel and Dr. Armitage weighed, reviewed, and evaluated the results of all psychological and medical testing conducted on Petitioner with the evidence of his intoxication at the time of the crime spree. Concluding that the evidence would have to come in through the testimony of Petitioner, the defense team then considered whether that strategy would be the best one for this case. Based on their own experiences and consultations with their expert and other experienced counsel, their observations of Petitioner’s inability to present himself well as a witness, as well as the Government’s ability to counter any expert testimony with evidence that Petitioner had sociopathie personality traits,[14] trial defense counsel decided that course of action would not be the most beneficial.
Strategy Decisions: Avoid Opening the Door to Evidence of a Sociopathie Personality
In Petitioner’s ease, the members heard an extensive amount of evidence about his difficult life, the problems with his family and school, his problems with alcohol and drugs, that he was a victim of and exposed to violence, and that he was obsessive of his manipulative girlfriend. Trial defense counsel, in conjunction with Dr. Armitage, conducted an extensive investigation of Petitioner, his family, friends, acquaintances, teachers, and work associates. They thought about the potential issues or defenses and what kind of evidence would support those theories. After they performed their investigation, they carefully reviewed what they had and then made an informed decision, in consultation with Petitioner, on what course of action would be best to save Petitioner from a death sentence.
There is no indication in this case from the numerous affidavits and records presented by appellate counsel that further investigation by trial defense counsel at the time of the trial would have revealed any other potential defenses or minimized aggravating factors in Petitioner’s background. Significantly, at the same time defense counsel were trying to present a particular picture of Petitioner, trial defense counsel were cautious and cognizant of doing what was necessary to avoid opening the door to evidence that would show Petitioner had a propensity to repeat this type of misconduct in the future. This evidence would have guaranteed a death sentence. Also, unlike in Wiggins, Petitioner’s defense counsel did present an extensive mitigation case during the merits of the case, as well as during the sentencing phase, in an attempt to convince the members that Petitioner would not be a further threat to society if confined and that confinement for life was appropriate over a sentence to death.
In this case, Petitioner had been exposed to, and was involved in, violent behavior.[15] In addition, Dr. Armitage believed Petitioner had a sociopathie personality and would commit this type of misconduct in the future. If Dr. Armitage testified, he would be subject to interview and cross-examination by the Government. There was a real potential that the Government could present very damaging evidence that would further support the death sentence.
Although the defense strategy was not to rely on a diminished capacity defense based on alcohol or drug intoxication, the defense attempted to solicit evidence of Petitioner’s intoxication on the night of the murders from his girlfriend. However, the only way the *166 defense could actually get this evidence before the members was by having Petitioner testify. The defense team, after consulting with Dr. Armitage, and having had the opportunity to observe Petitioner’s demeanor, decided that Petitioner “would likely become angry when cross-examined and exhibit a personality more representative of a homicidal maniac than a confused, misunderstood, desperate and disadvantaged youth.” Trial defense counsel believed that if Petitioner testified, he “might laugh or otherwise react inappropriately to a sensitive subject as [they] had seen him do on a number of occasions.” The defense made a cognitive decision that this was not the strategy they were pursuing. Trial defense counsel concluded that establishing that Petitioner was using alcohol and drugs — in particular cocaine — to give him courage to commit such heinous crimes, was not the best strategy in front of a military jury.[16]
Contrary to assertions by appellate defense counsel and claims made in defense appellate exhibits at the time of the trial, there was no indication that family, friends or acquaintances from Petitioner’s hometown and prior life were hesitant to talk to or cooperate with Petitioner’s counsel. Appellate defense counsel’s claim that it was Petitioner’s family members who were reluctant to be forthcoming with defense counsel is inconsistent with the fact that these witnesses did testify at trial and apparently cooperated with trial defense counsel in providing information about Petitioner.
Trial defense counsel sought out evidence of whether Petitioner’s girlfriend was involved in drug dealing and the murders and robberies. It was the friends of Petitioner’s girlfriend whom trial defense counsel thought were reluctant to speak with them. Trial defense counsel felt the friends were reluctant to talk based on the actions or conversation they may have had with a local Texas Ranger. Trial defense counsel had no evidence of any specific conversations or actions by the Texas Ranger but had “an impression” he may have said something to cause them to be less than forthcoming about Petitioner’s girlfriend.
Summary of the Wiggins Application
Applying the Strickland standard, the Supreme Court in Wiggins held that the petitioner’s claim of ineffective assistance of counsel should not be evaluated by examining whether counsel should have presented a mitigation case, but whether the investigation supporting their decision not to introduce mitigating evidence of Petitioner’s background was itself reasonable. 539 U.S. at 533, 123 S.Ct. 2527. Thus, this Court should conduct an objective review of the trial defense counsel’s performance, measured for reasonableness under prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from trial defense counsel’s perspective at the time of that conduct.
In Wiggins, trial defense counsel did not expand their investigation beyond the presentence investigation report and the Social Services records. Id. at 524, 123 S.Ct. 2527. The Supreme Court found that this lack of action fell short of the professional standards prevailing in Maryland in 1989. Id. The Supreme Court concluded that information in those reports should have prompted counsel to pursue leads that would have allowed the counsel to make an informed choice as to possible defenses. Id. at 525, 123 S.Ct. 2527. In Wiggins, trial defense counsel did not present much of a mitigation case. See id. at 526, 123 S.Ct. 2527. And, apparently there were no aggravating factors in Wiggins’s background and trial defense counsel did not discover any evidence to suggest that a mitigation case would have been counterproductive or that further investigation would have been fruitless. Id. at 535, 123 S.Ct. 2527. Petitioner’s situation was much different than Wiggins’s situation.
In Petitioner’s case, trial defense counsel did not stop or rely on a “presentence re *167 port” to evaluate what sentencing evidence may or may not exist. First, trial defense counsel had on the defense team, Dr. Armitage, a premier forensic psychiatrist who talked to and evaluated Petitioner personally and reviewed previous mental health evaluations. The defense team did pursue with Dr. Armitage potential evidence of psychiatric or psychological evidence. Unfortunately, the evidence did not exist with regard to Petitioner. Second, trial defense counsel visited and interviewed Petitioner’s family and acquaintances in Petitioner’s hometown to determine what, if any, mitigating or extenuation evidence may exist. Many of Petitioner’s family members, as well as childhood mentors, testified either in person or via stipulation to show that Petitioner was a “confused, misunderstood, desperate and disadvantage youth.” In addition, the defense presented testimony from the noncommissioned officers from the confinement facility to show Petitioner had been a good worker while in pretrial custody and had adjusted to confinement. Trial defense counsel were also able to obtain from cross-examination of the Petitioner’s battery commander that Petitioner responded well to leadership and was doing well until his involvement with his girlfriend.
Rather than taking the “shot gun” approach, trial defense counsel, after thorough consideration, decided that their strategy would be to focus on demonstrating a connection between Petitioner’s current misconduct and his past problems, his upbringing, his exposure to violence, lack of good leadership in his family environment, the fact that he has a tendency to be led, and that he had an obsession with his girlfriend who the defense attempted to portray as a manipulative user.[17] While the defense attempted to demonstrate a nexus between Petitioner’s past[18] and his misconduct, they also wanted to demonstrate that Petitioner could function and conform his actions in an environment of strong leadership to include confinement. The defense strategy was to present an extenuating and mitigating case on the merits and on sentencing. The defense’s end game was to avoid the death sentence and convince the panel members that confinement for life was a more appropriate punishment. The defense used everything at their disposal— witnesses, documentary evidence, voir dire, and argument — to portray their theory and to avoid opening the door for damaging evidence the Government could potentially use to counter their theory.
The facts in the case demonstrate that trial defense counsel, in conjunction with their forensic psychiatrist, clearly conducted a “reasonable” investigation of Petitioner, his family, his upbringing, his drug and alcohol use, and any potential defenses before deciding on a strategy for presenting a defense and a basis for the members to adjudge a life sentence versus a sentence to death. Trial defense counsel did not abandon their investigation at an unreasonable juncture. They looked at everything that was available to them at that point in time. They considered it. They even discussed the strategy with their client. They made decisions based on their experience as to what they thought would be the best course of action to preclude the members from adjudging a sentence of death. We cannot — and should not — evaluate trial defense counsel’s strategic choices solely based on the members’ final decision.
IV. AGGRAVATING NATURE OF PETITIONER’S CRIMES WAS THERE PREJUDICE?
Defense counsel are presumed competent and the burden to prove there is a eonstitu *168 tional violation is on the petitioner. United States v. Cronic, 466 U.S. 648, 658, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). “An ineffective assistance claim has two components: A petitioner must show that counsel’s performance was deficient, and that the deficiency prejudiced the defense.” Wiggins, 539 U.S. at 521, 123 S.Ct. 2527 (citing Strickland, 466 U.S. at 687, 104 S.Ct. 2052). Performance is deficient if it falls below “an objective standard of reasonableness,” which is defined in terms of prevailing professional norms. Strickland, 466 U.S. at 688, 104 S.Ct. 2052.
To establish prejudice, a petitioner must show there is a reasonable probability that, but for counsel’s unprofessional errors, the proceeding’s result would have been different. Id. at 694, 104 S.Ct. 2052. This Court should assess prejudice by reweighing the aggravating evidence against the totality of the mitigating evidence adduced both at trial and in the habeas proceedings. Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).
The manner and circumstances surrounding the murders in this case were heinous and egregious. Not only did Petitioner commit the murders which subjected him to the possibility of a death sentence, but he also committed three other serious crimes close in time to the murders. And, one of those crimes would likely have been a third murder if Petitioner had successfully fired the weapon into the head of the third taxi driver. Petitioner’s statement indicates it was his intent to shoot and kill the third taxi driver. Any additional testimony by family members or other individuals or evidence from further psychological or physiological testing would not have not have held up to the quantum of evidence necessary to pass the second “prejudice” prong of Strickland. It is difficult to see how this testimony would have created a reasonable probability that the members would have found against the death penalty had they heard any of the additional evidence as posited by appellate defense counsel. Compare Johnson, 344 F.3d at 571 (court could not say that the additional testimony of family members would have led to a different result and, in addition, the testimony would have opened the door to rebuttal evidence which would have undercut the image the defense would have tried to portray with that evidence).
The court members viewed a videotape made during an interview of Petitioner by the Army Criminal Investigation Command the day after the murders and attempted murder of the taxi cab drivers. The members observed Petitioner describe in excruciating detail, without prompting or extensive questioning by the agent, his acts of robbing the two 7-11 stores and committing the murders and attempted murder of the taxi cab drivers.
During his statement, Petitioner talked about how he discussed with a friend who or what entity he could rob to get $3,000 to $5,000 “quick” so he could buy his girlfriend a Christmas present. His only real issue with each robbery and murder was that he did not get much money from them and was far from obtaining the amount of money he thought he needed.
After the first two murders, Petitioner went to his girlfriend’s house and told her what he had done. In his statement, he said he told her “I’m real scared____ I’m not scared that I shot them____ [I’m] scared because if I could do something like that to two people like that, that it would probably happen to, that I could probably do it again.” Emphasis added. And, in just a few hours after this comment, Petitioner did try to “do it again” when he attempted to rob and shoot the third taxi cab driver.
During his crimes, it was Petitioner who was violent toward his victims.[19] Except for *169 the third taxi cab driver who resisted and fought off Petitioner, all of the victims of Petitioner’s crimes were compliant and not aggressive towards Petitioner in any respect. Petitioner was on a one-man crime spree. At the time of his actions, as he indicated in his statement, he felt he had nothing to lose by continuing to do what he was doing until he got the money he wanted or thought he needed. Fortunately, the spree came to an abrupt end when he failed to murder the third taxi cab driver.
Like Wiggins, Petitioner did experience an excruciating life growing up which included alcohol, drugs, sex, and violence. But unlike Wiggins, Petitioner had a history of committing violent acts at a very young age. If the defense had gone much further in presenting evidence of Petitioner’s troubled childhood and psychological make-up, the Government would have had an opportunity to show the likelihood Petitioner would repeat his conduct.
Any additional mitigation evidence that might have been presented could not have outweighed the brutality and senseless nature of Petitioner’s crimes. Petitioner started acting out violently as a young boy and he continued that progression of violence until he reached the point of murdering one person, then murdering another person, and then, attempting to murder a third person over a period of a few hours on a single night. Evidence of Petitioner’s background and violent life would have done nothing but confirm that Petitioner was the type of person who could perpetrate these malicious, merciless crimes. Any more evidence of Petitioner’s violent life would only confirm what Dr. Armitage and the defense counsel were trying to keep from the members — Petitioner had a “classic ‘sociopathie personality’ and could very easily commit similar crimes in the future.” Loving, 41 M.J. at 250. Appellate defense counsel have not presented any evidence that would create a reasonable probability that the members would have found against the death penalty had they heard any additional evidence.
V. CONCLUSION
This Court should not manipulate the “law” and the facts of this case to achieve a particular end. I agree that the facts of a case should be “salted down,” but the facts that have already been “salted down” should not be ignored. Here, the majority overlooks the facts in the original record of trial, the post-trial affidavits previously presented, and this Court’s previous review of those same facts. The issue of ineffective of assistance of counsel with regard to whether trial *170 defense counsel conducted a reasonable investigation was thoroughly reviewed on direct appeal. Regardless of whether this issue was addressed on direct appeal, I believe the facts necessary to conduct any further review are contained in the record as it currently exists and that this Court can make a determination of the reasonableness of trial defense counsel’s investigation based on those facts. I disagree that a DuBay hearing is necessary in this case. Applying Strickland, or Strickland in “light of Wiggins,” I would deny the petition for extraordinary relief based on the facts in this case. Therefore, I respectfully dissent.

. The affidavits submitted by Petitioner’s family members with details regarding Petitioner’s childhood were admitted by this Court as appellate exhibits on April 23, 1993. United States v. Loving, 38 M.J. 178 (C.M.A.1993). The original opinion in this case was decided on November 10, 1994. United States v. Loving, 41 M.J. 213 (C.A.A.F.1994). Petitioner’s three defense counsel provided affidavits in March 1992 in response to an order of the Army Court of Military Review. Affidavit of JDS, dated March 4, 1992; Affidavit of WHI, dated March 2, 1992; Affidavit of DLH, dated March 3, 1992.

. Compare the one-year time limitation under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(d)(1)(2000), and the two-year new trial time limitation in the military. Rule for Courts-Martial (R.C.M.) 1210.

. In the military justice system, one of the most frequently litigated issues is the effectiveness of counsel. Francis A. Gilligan & Fredric I. Lederer, Court-Martial Procedure § 5-55.00, at 201-13 (2d ed.1999 & 2004 Supp.) and cases cited therein.

. Appellate defense counsel raised numerous appellate issues in Loving, 41 M.J. at 227. One of the issues raised was the effectiveness of counsel. Id. at 299. "As they did before the court below, they have not identified in what particulars the investigation was inadequate or what additional issues should have been raised.” Id.

. The majority relies on essentially the same post-trial affidavits and documents it had before it on the direct appeal to now conclude that it did not review the "reasonableness” of the investigation by defense counsel.

. The majority opinion describes Wiggins as clarifying and illuminating "the standards for a reasonable investigation in a criminal trial, in general, and in a death penalty case, in particular.”

. See McHone v. Polk, 392 F.3d 691, 710 (4th Cir.2004):
Accordingly, we hold that where, as here, counsel has investigated and presented mitigating evidence pertaining to petitioner’s childhood and that the jury has credited such evidence and nonetheless imposed the death penalty, that counsel’s decision not to investigate further, particularly where such investigation would bear little — if any — fruit, cannot support a Strickland claim.
Johnson v. Bell, 344 F.3d 567, 574 (6th Cir.2003) (Court held that the testimony of petitioner’s family during mitigation sentencing would not have held up to the quantum of evidence necessary to pass the second "prejudice” prong of Strickland because the court did not see how this testimony would have created a reasonable probability that the jury would have found against the death penalty had they heard this testimony.); Wilson v. Ozmint, 352 F.3d 847, 866 (4th Cir.2003) (Unlike in Wiggins, the appellant’s counsel made the decision to not present additional mitigation evidence after a thorough investigation.); Coble v. Dretke, 444 F.3d 345, 356 (5th Cir.2006) ("Unlike in Wiggins, Coble’s attorneys not only investigated his background, they also offered a mitigation case.”); Marshall v. Hendricks, 313 F.Supp.2d 423, 440 (D.N.J.2004) ("Although several Supreme Court decisions have applied Strickland to ineffective assistance of counsel claims at the sentencing phase of a capital trial, all are factually distinguishable from the present case.”); Bucklew v. Luebbers, 436 F.3d 1010, 1014 n. 3 (8th Cir.2006) (Court agreed with district court’s interpretation that Wiggins did not establish a "supervening precedent but demonstratejd] specific applications of Strickland to particular fact situations.’’).

. Affidavit by JDS dated March 4, 1992; Affidavits by WHI dated March 2 1992, February 22, 1993, February 23, 1993, respectively; Affidavits by DLH dated March 3 1992, February 7, 1993, respectively.

. The family’s affidavits were admitted by the Court on April 23, 1993, as Appellate Exhibits. 38 M.J. at 178-79 (C.M.A.1993).

. In Wiggins, the defense counsel relied on a report to evaluate the Wiggins’s background and determine whether to investigate any further. 539 U.S. at 524, 123 S.Ct. 2527. In this case, trial defense counsel visited and interviewed a number of individuals from Petitioner’s hometown, family, school, background, and unit. The defense presented numerous witnesses and documents at trial. Petitioner's counsel did investigate his case.

. According to their affidavits, trial defense counsel:
did extensive investigation of Private Loving’s past, from birth through the date of the offenses. Major [¶] spent approximately a week in Private Loving's home town speaking with his family, his ... teachers, his neighbors, religious leaders who knew him and the coaches who worked with him. We interviewed dozens of people in Private Loving’s unit and numerous friends and acquaintances. We had long discussions with Private Loving himself.

. Wiggins's attorney did not utilize the services of a forensic psychiatrist or request additional psychological testing as was conducted in Petitioner’s case.

. Unlike in Wiggins, Petitioner was interviewed extensively by Dr. Armitage and other tests and evaluations Dr. Armitage thought were appropriate were conducted. Dr. Armitage participated in evaluating not only the psychiatric evidence present in the case, but also assisted trial defense counsel in evaluating the evidence in the entire case, as well as how certain presentations or strategies would be more favorably received by the court members. Dr. Armitage even prepared personality profiles of the court members for trial defense counsel to assist in this assessment.

. The defense was concerned that the Government would be able to counter any intoxication defense by pointing out the details of the crimes themselves, and Petitioner’s ability to recall the intricate details as well as his thought processes during the crimes to law enforcement personnel without the prompting or intensive questioning that usually accompany an interview of a suspect.

. According to a Sanity Board Report and affidavits, Petitioner sexually assaulted his ten-year-old female niece when he was around sixteen years of age. He acknowledged engaging in sexual molestation of other young girls but did not provide any details. Petitioner also acknowledged involvement in petty crimes and drug abuse as well as fighting.

. Defense counsel concluded that Petitioner was unable to testify effectively in his own defense. “Despite extensive work with Dr. Armitage, and a number of sample direct and cross examination exercises conducted by the defense team, Private Loving usually did himself more harm than good on these 'test runs.’ ... [He had] a tendency to smile when giving answers concerning the killings.” He also was "easily led and easily frustrated."

. To support the theory that Petitioner’s girlfriend was the source of his misconduct, the defense presented evidence that Petitioner was a "naive, immature, individual who could be easily manipulated.” They presented members from Petitioner’s unit to talk about the effect the girlfriend had on Petitioner.

. Specifically, part of the defense strategy was to essentially show that "a poor upbringing created an enhanced risk” of misconduct. In order to do this, the defense:
presented evidence about the violence in Private Loving's neighborhood, the poor quality of his family (particularly his father), and the poor conditions at his school.... how his father was a burned out alcoholic with a long criminal record and put on Private Loving’s older brother and mentor, a man with a violent past.

. Petitioner talked about his girlfriend and how much he cared for her to the first taxi cab driver, Private (PVT) Christopher L. Fay. Petitioner was aware that PVT Fay was young and a soldier. Petitioner shot PVT Fay in the back of the head when he believed PVT Fay had not given Petitioner all of the money he had with him. Petitioner sat there looking at the hole in the back of PVT Fay's head and the blood "gushing out.” He then cocked the gun again and shot PVT Fay again in the head and then he sat there observing "two holes in the back of [PVT Fay’s] head.” Petitioner returned to his barracks room to count his bounty. When Petitioner realized he didn't *169 get much money, he thought about "nothing but ... getting more money ... Because if I could do something like that nothing matters too much” so he immediately went to call for a second taxi to rob. He called for PVT Fay's cab at about 8:00 p.m. He called for the second cab at about 8:15 p.m. When Petitioner got into the second cab with Bobby Sharbino, he engaged in a personal conversation. Petitioner talked about the military and became aware that Sharbino was in the military for twenty-one years and that he was wearing a hearing aid. Before shooting Sharbino in the head, Petitioner ordered him to lie down in the seat. Sharbino complied with the order and then Petitioner shot him in the head. Petitioner then returned to his girlfriend's house. Shortly thereafter, he accompanied her and some friends to a local club. While at the club, Petitioner got into an altercation with a man for looking at his girlfriend. He drew the gun and invited the man to go outside. In the process, Petitioner stumbled, dropped the weapon, which was cocked, and it discharged. Petitioner and his girlfriend departed the club in a cab. Petitioner dropped his girlfriend off to go to her house but he stayed with the cab in order to commit another robbery and murder. During the robbery, Petitioner grabbed the back of Howard D. Harrison’s head and told him to open his mouth. As Petitioner was attempting to shove the barrel of the gun into Harrison’s mouth, Harrison grabbed the gun. As the two men tussled over the gun, it discharged. Harrison tried to fire the weapon at Petitioner but it would not fire. Petitioner bit Harrison on the hand while still struggling over the gun. Harrison, while holding onto the gun, attempted to get out of the cab and then, Petitioner bit Harrison on the head. Harrison tried to unsuccessfully fire the gun a second time. When it did not fire, Harrison let the weapon go and hit Petitioner. Petitioner then began biting Harrison on the back. Harrison broke free and began to run but Petitioner pursued him. Harrison stopped and then hit petitioner again. Petitioner took off in the direction of his girlfriend’s house. After Petitioner departed the area, Harrison went back to the cab to call the dispatcher to report the incident.